729 F.2d 713
 115 L.R.R.M. (BNA) 3665, 100 Lab.Cas. P 10,945,
15 Fed. R. Evid. Serv. 1122
 ONA CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
International Union, United Automobile, Aerospace and
Agricultural Implement Workers of America, Intervenor.
INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Ona Corporation, Intervenor.
 No. 82-7308.
 United States Court of Appeals,
Eleventh Circuit.
 April 9, 1984.
 
 John J. Coleman, Jr., Braxton Schell, Jr., William Michael Warren, Birmingham, Ala., for Ona Corporation.
 James D. Fagan, Jr., Atlanta, Ga., for UAW.
 Elliott Moore, Deputy Associate Gen. Counsel, Div. of Enforcement Litigation, N.L.R.B., Washington, D.C., Elaine Patrick, Washington, D.C., for N.L.R.B.
 Petitions for Review of an Order of The National Labor Relations Board.
 Before TJOFLAT and FAY, Circuit Judges, and WISDOM*, Senior Circuit Judge.
 FAY, Circuit Judge:
 
 
 1
 This case arises out of a hotly contested effort by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") to organize the maintenance and production employees of Ona Corporation. The Administrative Law Judge ("ALJ") found that Ona had repeatedly violated Section 8(a)(1)[1] of the National Labor Relations Act ("the Act") during the union campaign and that it also had violated Section 8(a)(3)[2] of the Act by discharging employee Dorothy Wilson. The ALJ concluded that the employer's violations made a fair election unlikely and that 281 of 552 employees in the bargaining unit had signed union authorization cards so he ordered the company to recognize and bargain with the UAW without an election. NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). The National Labor Relations Board ("the Board") issued an order on May 28, 1982, affirming the ALJ's findings that Ona had violated Sec. 8(a)(1) of the Act but reversing his finding that Dorothy Wilson had been unlawfully discharged.[3] The Board agreed with the ALJ that the union had obtained a card majority and that the unfair labor practices engaged in by the company would preclude the possibility of a fair election so it adopted the ALJ's bargaining order.
 
 
 2
 Ona brought a petition to review and set aside the bargaining order issued by the Board alleging that it was based on an erroneous finding that a majority of employees authorized the union to represent them. The UAW filed a petition seeking review of the Board's finding that Dorothy Wilson's discharge did not violate Sec. 8(a)(3) of the Act. The Board filed a cross-application for enforcement of its order. Since we conclude that the union did not have the card majority which is a prerequisite for a Gissel II bargaining order,[4] we vacate that portion of the Board's order which requires the company to bargain with the union without an election and remand the case for proceedings consistent with this opinion. We enforce that portion of the Board's order which found that Dorothy Wilson had not been unlawfully discharged.
 
 I. PROCEDURAL BACKGROUND
 
 3
 Ona, a corporation located in Huntsville, Alabama, manufactures small gasoline engines and generators for use in recreational vehicles. In early April, 1979, the UAW began the third union organizational effort at Ona within three years by soliciting authorization cards from Ona's approximately 560 employees. On April 27, 1979, the UAW, based on a card majority, filed a petition with the Board's Regional Office seeking a representation election in a unit of the Company's production and maintenance employees. The election was scheduled for June 22, 1979.
 
 
 4
 Prior to the election, the UAW filed unfair labor practice charges with the Board's Regional Office, alleging that the Company had violated Section 8(a)(1) and (3) of the Act, 29 U.S.C. Sec. 158(a)(1) and (3) (1976), on numerous occasions during the election campaign. Nevertheless, the election was held as scheduled. Following the election, the UAW challenged the votes of thirty-three employees and filed objections to the election. The objections were essentially identical to its pending unfair labor practice charges. The unfair labor practice charges, ballot challenges and election objections were consolidated for hearing before an Administrative Law Judge.
 
 
 5
 The ALJ heard testimony on all three cases intermittently from January 7, 1980, until March 18, 1980. In his decision and recommended order he found that the company had repeatedly violated Section 8(a)(1) during the union campaign, that it had violated Sections 8(a)(3) and 8(a)(1) by discharging employee Dorothy Wilson and that the union's ballot challenges had no merit. He recommended that the union's objections to the election be sustained and that the company be ordered to bargain with the union based on the authorization card majority the union had obtained.
 
 
 6
 Both Ona and General Counsel filed exceptions to the ALJ's decision. On May 28, 1982, the Board entered its decision reversing the ALJ's findings that the company unlawfully discharged Dorothy Wilson and that the company unlawfully prohibited an employee from distributing union insignia. The Board adopted, without comment or analysis, the remainder of the ALJ's recommended order.
 
 
 7
 On June 17, 1982, the UAW filed a motion to sever the representation case from the unfair labor practice case and requesting that the now-valid challenged ballots be counted. On June 22, 1982, Ona filed a motion for reconsideration and reopening of the record so that the Board could accept evidence of changes in circumstances at Ona since the 1979 election. The Board denied Ona's motion but granted the UAW's motion and the remaining ballots were opened and counted. The final tally consisted of 192 votes for and 203 votes against the UAW. Since the Board found merit in the union's objections to the election, it set the election aside and ordered the company to bargain with the UAW.
 
 
 8
 On September 20, 1982, the UAW sought review of the Board's order upholding the discharge of Dorothy Wilson in the District of Columbia Circuit Court of Appeals. On September 27, 1982, Ona filed its petition for review of the Board's bargaining order. Ona does not contest the Board's findings that certain conduct of its employees violated Section 8(a)(1) of the Act. Instead it contends that the union did not possess authentic valid authorization cards from a majority of the employees as of April 19, 1979, and that the Board therefore erred in issuing a Gissel II bargaining order. The District of Columbia Circuit Court of Appeals transferred its case to this court and both cases were consolidated in this appeal. The Board then filed a cross-application for enforcement of its order.
 
 II. THE STANDARD OF REVIEW
 
 9
 The Board is charged with the responsibility for ensuring that the Act's underlying goal of industrial peace through employee free choice is achieved,[5] a responsibility which it could not discharge if it did not receive our respect for its judgment. Thus, the remedy chosen by the Board must "be given special respect by reviewing courts." NLRB v. Gissel, 395 U.S. at 612 n. 32, 89 S.Ct. at 1939 n. 32. Nevertheless, this court is an independent appellate court and does not function simply as the Board's enforcement arm. It is our responsibility to examine carefully both the Board's findings and its reasoning, to assure that the Board has considered the factors which are relevant to its choice of remedy and has chosen a remedy that effectuates the purposes of the Act. See, e.g., NLRB v. Brown, 380 U.S. 278, 291-2, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965).
 
 
 10
 Ona is challenging the Board's factual findings that a majority of the employees signed valid authorization cards. Our review of the Board's findings of fact is limited to a determination of whether or not the findings are supported by substantial evidence on the record considered as a whole. 29 U.S.C. Sec. 160(e) (1976); Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); Weather Tamer, Inc. v. NLRB, 676 F.2d 483, 487 (11th Cir.1982). In this case, the Board's factual findings were based on credibility choices made by the ALJ. Since the ALJ has an opportunity to hear the testimony and view the witnesses he is ordinarily in the best position to make a credibility determination. NLRB v. Florida Medical Center, Inc., 576 F.2d 666, 671 (5th Cir.1978). Thus, as a general rule courts are bound by the credibility choices of the ALJ, even if they "might have made different findings had the matter been before [them] ... de novo." Gulf States Manufacturers, Inc. v. NLRB, 579 F.2d 1298, 1329 (5th Cir.1978).[6]
 
 
 11
 However, the Fifth Circuit has delineated certain situations in which the court will not be bound by the ALJ's credibility determinations. NLRB v. Jacob E. Decker & Sons, 569 F.2d 357, 364 (5th Cir.1978). First, the ALJ's credibility finding will be disregarded if it is inherently unreasonable or self-contradictory. Chromalloy Mining and Minerals, Alaska Division v. NLRB, 620 F.2d 1120 (5th Cir.1980); NLRB v. Florida Medical Center, 576 F.2d at 671. Second, the reviewing court is "not compelled to respect" credibility choices "based on an inadequate reason, or no reason at all". NLRB v. Moore Business Forms, Inc., 574 F.2d 835, 843 (5th Cir.1978). With these considerations in mind we turn to our explanation of our conclusions in this case.
 
 III. THE BARGAINING ORDER
 
 12
 The National Labor Relations Act provides that a labor organization designated by a majority of the employees in an appropriate bargaining unit shall be the exclusive bargaining agent for those employees.[7] But an employer is under no obligation to bargain with a union which does not represent a majority of its employees.[8] Linden Lumber Division v. NLRB, 419 U.S. 301, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974). In a typical case, the union demonstrates majority support and is recognized as the bargaining representative by petitioning the NLRB for a Board-conducted representation election. In order to demonstrate this majority support to the Board the union must make a "showing of interest" that a majority of the employees in a designated bargaining unit want the union as their exclusive bargaining representative. To do this, the union gathers, from a majority of the employees in a bargaining unit, signed authorization cards. In other cases, bargaining status may be established through the employer's voluntary recognition of the union's majority status. If unfair labor practices disrupt the election process and make a future fair election impossible, a third method of establishing union representation is through a Board-ordered recognition without an election.
 
 
 13
 In NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court established the guidelines that the Board must follow before ordering union recognition without an election. The Court found that the Board has the power to order an employer to bargain with a union when the employer has committed unfair labor practices "that interfere with the election processes and tend to preclude the holding of a fair election." Id. at 594, 89 S.Ct. at 1390. Balancing the sometimes conflicting goals of deterring employer misbehavior and effectuating employee free choice, the Court recognized two different kinds of situations which would justify the Board entering a bargaining order. In the first situation, a union has never demonstrated majority support in an appropriate unit but the Board issues a bargaining order because the employer's unfair labor practices are so "outrageous" and "pervasive" that their "coercive effects cannot be eliminated by the traditional remedies." Id. at 613-614, 89 S.Ct. at 1940, quoting, NLRB v. S.S. Logan Packing Co., 386 F.2d 562, 570 (4th Cir.1967).[9] The second type of situation identified by the Court as appropriate for the issuance of a bargaining order involves those cases where the unfair practices are not as "outrageous" but instead are "marked by less pervasive practices which nonetheless have the tendency to undermine majority strength and impede the election processes." Id. at 614, 89 S.Ct. at 1940. In order to protect employee free choice in these less "outrageous" cases, the Board must determine not only that a fair election is improbable but also "that at one point the union had a majority." Id. If the unfair labor practices have only a "minimal impact on the election machinery," a bargaining order is completely inappropriate. Id. 395 U.S. at 615, 89 S.Ct. 1940. In this case the Board has determined that Ona's misconduct fell within the Gissel II situation.[10]
 
 IV. DETERMINATION OF MAJORITY STATUS
 
 14
 A bargaining order in a Gissel II case is appropriate only where there is a showing, based on substantial evidence, that: (1) at one point the union had a valid card majority; (2) the majority was dissipated by the unfair labor practices, and (3) the possibility of ensuring a fair election by the use of traditional remedies is slight. 395 U.S. at 614, 89 S.Ct. at 1940. Thus, before we can consider enforcing the bargaining order issued by the Board, it is necessary for us to determine whether the UAW had obtained a valid card majority.
 
 
 15
 On April 19, 1979, there were 552 employees in the maintenance and production bargaining unit. Thus, by that date, 277 employees in the unit must have designated that they wanted the union to represent them in order to constitute a majority. The General Counsel offered into evidence the authorization cards of 286 individuals. Vol. VII p. 2957. The Board found that authorization cards had been validly executed by 281 of these employees.[11] Ona contends that the union did not achieve a majority because many of the cards were obtained through misrepresentation and are therefore invalid under the standards set down in Gissel. In addition, Ona asserts that many of these cards were introduced and accepted into evidence without the proper evidentiary basis. We agree with the company that many of the cards were not properly authenticated and therefore there is insufficient evidence to establish the card majority needed by the Board before it can issue a Gissel II bargaining order.
 
 A. Cards Offered Through Ezell Whorton
 
 16
 Section 10(b) of the Act, 29 U.S.C. Sec. 160(b) (1976), provides that Board proceedings "shall so far as practicable, be conducted in accordance with the [federal] rules of evidence...." Federal Rule of Evidence 901(a) requires that evidence presented to the court be authenticated.[12] Rule 901 does not specify how a piece of evidence must be authenticated but Subsection (b) lists various methods of authentication. One of the methods stated in the rule, and the method used by General Counsel in this case, is authentication through the testimony of a witness with first-hand knowledge. Federal Rule of Evidence 901(b)(1).[13]
 
 
 17
 The largest single group of cards introduced at the hearing was proffered through witness Ezell Whorton who attempted to authenticate 102 cards (Nos. 128-229). Ona alleges that none of these cards were properly authenticated. Whorton divided the cards into two groups, and categorically stated with respect to each card that he either distributed it unsigned and then received it signed (Nos. 190-228), or that he distributed it to an employee who worked in his immediate area and witnessed its signing (Nos. 128-189, 229). Because we find serious deficiencies in Whorton's testimony and we find the credibility findings of the ALJ to be self-contradictory we find that the 102 cards offered through Whorton were not properly authenticated.
 
 
 18
 Whorton's testimony is replete with inconsistencies and falsehoods and is totally unreliable. When he was authenticating cards 128-189, his invariable testimony on direct was that he remembered giving each employee the card; making a statement as to the purpose of the card; and receiving the card back from the employee personally. Vol. III, pp. 1128-1175. His testimony as to these cards was so mechanical that at one point he was reminded by the ALJ that specific recollection, rather than mere rote recitations, was required to authenticate the cards. Vol. III, p. 1138. The ALJ specifically found that "Whorton was relying, partially if not entirely, on a 'page' containing a list which he had composed and/or reviewed for trial, as opposed to independent recollection."[14] Vol. VII, p. 2960. On cross-examination, Whorton consistently could not remember where each card had been distributed; where the employee in question worked in the plant; and what, if anything, the solicited employee said when the card was given to him and later returned to Whorton; and what he told the employees as he distributed the cards. Vol. III, pp. 1209-1258. Whorton's testimony is further suspect because on cross-examination he failed to remember his earlier testimony on direct.
 
 
 19
 To fully appreciate the significance and magnitude of Whorton's inconsistencies, and to understand why the credibility findings of the ALJ are self-contradictory several of the ALJ's comments should be noted. The ALJ starts his discussion on the Sec. 8(a)(1) violations by stating:
 
 
 20
 Many of the allegations are entirely dependent upon the testimony of employee Ezell Whorton. However, as discussed infra, there are numerous problems with Whorton's credibility.[15]
 
 
 21
 Vol. VII, p. 2899.
 
 He continues by stating:
 
 22
 Whorton was employed by [Ona] at the time of the hearing, and this is, of course, ordinarily a factor which would support his credibility. However, in Whorton's case, any such presumption is overcome. Whorton had an extremely unfavorable demeanor: he evinced hostility which permeated the entirety of his testimony; he punctuated his testimony with gratuities even after being instructed to desist; and he had a supercilious air about him that left the impression that he was there principally to impress upon everyone just how intelligent he is.... In his testimony about authorization cards, he professed memory of details which, it is clear, he simply did not have. (footnotes omitted, emphasis added).
 
 
 23
 Vol. VII, p. 2900.
 
 
 24
 The ALJ concludes this section of his order by stating:
 
 
 25
 These and other misrepresentations by Whorton have caused me to ponder long and hard Respondent's arguments for wholesale rejection of Whorton's testimony and the cards relying solely upon it, but, with distinct misgivings, I shall not do so. (emphasis added).
 
 
 26
 Vol. VII, p. 2961.
 
 
 27
 Although the ALJ noted throughout his order that Whorton's credibility was suspect, he decided to accept as valid the authorization cards because of his "firm belief that all of the cards are authentic." Vol. VII, p. 2961. There is no evidence in the record that these cards were authenticated by any other means. The ALJ's findings as to these cards are totally self-contradictory.
 
 
 28
 By concluding, without evidence, that the cards were authentic, the ALJ misperceived the burden of proof. The General Counsel, and ultimately the Board, bear the burden of proving that the union represented a majority of employees in order to sustain the imposition of the bargaining order. See, e.g., Montgomery Ward & Co., Inc. v. NLRB, 668 F.2d 291 (7th Cir.1981); NLRB v. West Sand and Gravel Co., 612 F.2d 1326 (1st Cir.1979); G.P.D., Inc. v. NLRB, 406 F.2d 26 (6th Cir.1969); Crawford Mfg. Co. v. NLRB, 386 F.2d 367 (4th Cir.1967). General Counsel never satisfied the authentication requirement of Federal Rule of Evidence 901 and therefore the burden of proof never shifted to Ona. There was thus no reason for Ona to introduce other signatures of the employees for comparison purposes or to retain a handwriting expert in an attempt to disprove the signatures on the cards.
 
 B. Cards Offered Through Larry Kennedy
 
 29
 Ona asserts that the ALJ erred in admitting into evidence the ten cards authenticated by the testimony of Larry Kennedy. The Company asserts that since it was able to discredit Kennedy's testimony as to two of the cards, which were later authenticated by the signers themselves, then the remaining eight cards should therefore be excluded.[16] Because the ALJ's decision to credit the remainder of Kennedy's testimony and admit all of the cards was not unreasonable or self-contradictory we find that the cards were properly admitted into evidence.
 
 C. Misrepresentation
 
 30
 In order to prove a card majority by substantial evidence the authorization cards must not only be authenticated but the cards must also be properly validated as expressions of the signer's desire to designate the UAW as his or her bargaining representative. The company asserts that at least fourteen cards in this case must be rejected because of misrepresentations made to the signers at the time the cards were solicited. If the signers were assured that the cards would be used only to obtain an election, instead of to designate the union as their bargaining agent, then the cards would be invalid.
 
 
 31
 The validity of union authorization cards is determined by the rule announced in Cumberland Shoe Corp., 144 N.L.R.B. 1268 (1963), enf'd. 351 F.2d 917 (6th Cir.1965), and adopted by the Supreme Court in Gissel. The rule states that:
 
 
 32
 if the card itself is unambiguous (i.e., states on its face that the signer authorizes the Union to represent the employee for collective bargaining purposes and not to seek an election), it will be counted unless it is proved that the employee was told that the card was to be used solely for the purpose of obtaining an election.
 
 
 33
 NLRB v. Gissel, 395 U.S. at 584, 89 S.Ct. at 1925.
 
 
 34
 Thus all that General Counsel has to do is place in evidence properly authenticated and unambiguous authorization cards. The burden is then on the employer to invalidate these cards by demonstrating that the clear language of the card was "deliberately and clearly cancelled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature."[17] Id. at 606, 89 S.Ct. at 1936. Mere mention that the card may be used to obtain an election first is not enough to invalidate the card.
 
 
 35
 The card used by the union in this case was unambiguous in its language.[18] None of the testimony offered by Ona to invalidate the cards "deliberately and clearly cancelled" the language of the cards. For example, employee Sinnard told Joyce Hollingsworth that "if they got enough cards signed that they would have an election for a union...."[19] Vol. VI, p. 2864. Carter, who solicited three of the challenged cards, told the employees that they "need fifty percent of the people in the plant to sign these cards for us to have an election." Vol. II, p. 718. Employee Floyd told employee Keith that the employees needed "a two-thirds signature on this card to get a petition for an election to be held." Vol. IV, p. 1432.[20]
 
 
 36
 These representations are in substance identical to those representations which the Supreme Court specifically found to be within the limits set down in Cumberland Shoe.[21] As the former Fifth Circuit stated in J.P. Stevens & Co. v. NLRB, 441 F.2d 514, 524 n. 14 (1971):
 
 
 37
 Much of the opposition testimony proves no more than that an election was mentioned at the meetings.... [M]ere mention that the cards may be used to secure an election is not sufficient to vitiate their efficacy. Such cards can be disregarded only when Union organizers solicit them on the explicit or indirectly expressed representation that they will use such cards only for an election. NLRB v. Gissel Packing Co., supra, 395 U.S. at 607-608, 89 S.Ct. 1918 & n. 27.
 
 
 38
 Applying the test adopted by the Supreme Court in Gissel the Board reasonably concluded that there was no misrepresentation as to these fourteen cards and they were properly admitted in evidence.
 
 V. THE DISCHARGE OF DOROTHY WILSON
 
 39
 The union challenges the Board's finding that employee Dorothy Wilson was not improperly discharged. Sections 8(a)(3) and 8(a)(1) of the Act prohibit an employer from discriminatorily transferring or discharging an employee on the basis of union activity. The General Counsel has the burden of establishing unlawful motivation by a preponderance of the evidence. NLRB v. Bogart Sportswear Mfg. Co., 485 F.2d 1203, 1208 n. 8 (5th Cir.1973). If the Board finds, as in this case, that the General Counsel has failed to prove unlawful motivation, reviewing courts should affirm "unless [the Board's finding] has no rational basis." District 65, Distributive Workers of America v. NLRB, 593 F.2d 1155, 1164 (D.C.Cir.1978). Accord: Chamber of Commerce v. NLRB, 574 F.2d 457, 463-464 (9th Cir.1978). We find that the Board's determination that employee Dorothy Wilson was lawfully discharged one month before the union campaign began is supported by substantial evidence and we therefore enforce that part of the Board's order.
 
 
 40
 On February 26, 1979, employee Dorothy Wilson returned to work after a seven-week medical leave of absence with a note from her physician stating, without qualification, that she was able to work. Prior to her medical leave Dorothy Wilson had operated an Endomatic machine, which had required her to lift parts weighing between one and two pounds. During her absence another employee had been assigned to that machine. On her first day back at work she was assigned to a Bohle machine, which required her to lift parts weighing up to twelve pounds. She complained of pain as a result of the lifting and she was reassigned to an Endomatic machine for the rest of the day.
 
 
 41
 The next day, Dorothy Wilson was assigned to operate a copy lathe, a machine which she had operated prior to her leave of absence, which required her to lift parts weighing up to fifteen pounds. She again complained and was sent to the Company nurse. Her supervisor checked with her physician who assured him that her only problem was soreness and that she should be assigned a lighter schedule for the rest of the week. Her supervisor followed this suggestion.
 
 
 42
 The following Monday, March 5th, Dorothy Wilson was assigned again to operate the copy lathe machine. Although she complained about the assignment she was not reassigned to the Endomatic machine. She worked the copy lathe from March 5th through March 8th but experienced serious problems on that job, as evidenced by her low production levels for each of the four days.[22] Wilson was warned on March 6th and 7th that her performance level was inadequate. On March 9th she was discharged based solely on her inadequate job performance.
 
 
 43
 To prove that the company violated Sec. 8(a)(3) of the Act the General Counsel must prove by substantial evidence that the discharge is a result of interference in the employee's statutory rights to union representation. NLRB v. McGahey, 233 F.2d 406 (5th Cir.1956). If the employer comes forward with evidence of a motive for firing, devoid of union animus, then the General Counsel must demonstrate explicitly that an improper motive contributed to the discharge. To accomplish this it is necessary to have proof of an employer's knowledge of his employee's union activity. See, NLRB v. Dillon Stores, 643 F.2d 687, 692 (10th Cir.1981). The Board in this case found no evidence linking Wilson's discharge to any union activity. Vol. VII, p. 3076. In fact, the union did not make its first attempt to organize the Company's employees until late March and did not launch its in-plant union campaign and authorization card drive until early April, after Wilson's discharge. We find that the Board correctly concluded that Wilson's job performance during the week of March 5th-9th was exceedingly low and was the basis for her discharge. We therefore enforce that part of the order which dismisses from the complaint all allegations that the company violated Section 8(a)(3) of the Act when it discharged Dorothy Wilson.
 
 CONCLUSION
 
 44
 Since Gissel II requires that the union attain majority support before issuing a bargaining order and we have found that the 102 cards offered through Ezell Whorton were not properly admitted in evidence, the General Counsel did not establish a card majority and we cannot enforce the bargaining order at this time.[23] Ona did not contest the Board's findings that certain conduct of its employees violated Section 8(a)(1) of the Act, therefore the Board's order with respect to these violations is enforced. We find no Section 8(a)(3) violation in the discharge of Dorothy Wilson so we enforce the Board's order as to the discharge. Therefore, enforcement is DENIED in part and GRANTED in part, and the case is REMANDED to the Board for further proceedings consistent with this opinion.
 
 
 
 *
 Honorable John Minor Wisdom, U.S. Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(1) (1976), makes it an unfair labor practice for an employer to interfere with, restrain or coerce employees in the exercise of their rights, inter alia, to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection
 
 
 [2]
 Section 8(a)(3), 29 U.S.C. Sec. 158(a)(3) (1976), provides that:
 (a) It shall be an unfair labor practice for an employer ...
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.
 An employer violates this section when it discharges an employee because of his union activities.
 
 
 [3]
 The Board summarily adopted most of the ALJ's findings of fact. Therefore, a reference to the ALJ's findings should be understood to be consistent with those of the Board, and vice versa, unless the contrary is stated
 
 
 [4]
 Under Gissel a bargaining order may issue, without a showing that the union at one point represented a majority of the employees, if the employer's "outrageous" and "pervasive" unfair labor practices make it impossible to hold a fair election. These outrageous cases are labelled Gissel I. Gissel II cases are those "less extraordinary cases marked by less pervasive practices" which therefore require the union to represent a majority of the employees before a bargaining order may issue
 
 
 [5]
 The congressional declaration of purpose in section 1 of the Act, 29 U.S.C. Sec. 141(b) (1976), provides:
 Industrial strife which interferes with the normal flow of commerce and with the full production of articles and commodities for commerce, can be avoided or substantially minimized if employers, employees, and labor organizations each recognize under law one another's legitimate rights in their relations with each other, and above all recognize under law that neither party has any right in its relations with any other to engage in acts or practices which jeopardize the public health, safety, or interest.
 It is the purpose and policy of this chapter, in order to promote the full flow of commerce, to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other, to protect the rights of individual employees in their relations with labor organizations whose activities affect commerce, to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce.
 Section 7 originally protected only the right to unionize but was amended when the Taft-Hartley Act was passed in 1947 to expressly protect employees' right not to engage in collective activity. It provides:
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.
 29 U.S.C. Sec. 157 (1976).
 
 
 [6]
 Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are binding upon this court unless and until they are overruled by the Eleventh Circuit sitting en banc. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981)
 
 
 [7]
 Section 9(a) provides inter alia:
 Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment....
 
 
 [8]
 Indeed, bargaining with a union which does not represent a majority of employees is an unfair labor practice, unless the company is ordered to do so by the Board, since it constitutes company support for a union in violation of Section 8(a)(2) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(2) (1976)
 
 
 [9]
 The Fifth Circuit, in J.P. Stevens & Co., Inc., v. NLRB, 441 F.2d 514 (5th Cir.1971), found that even if the union never possessed a valid card majority, a bargaining order was appropriate since this was one of those "exceptional" cases marked by "outrageous" and "pervasive" unfair labor practices. But see, Conair Corp. v. NLRB, 721 F.2d 1355 (D.C.Cir.1983) (issuing a bargaining order in a Gissel I case is an abuse of discretion by the Board since this part of the Gissel decision was just dictum)
 
 
 [10]
 The Supreme Court in Gissel made it clear that it is the Board's task to determine which of the categories of severity embraced the employer's coercive and discriminatory conduct. 395 U.S. at 612 n. 32, 89 S.Ct. at 1939 n. 32
 
 
 [11]
 The Board initially rejected five cards and the UAW has not challenged that finding. Dorothy Wilson's card (No. 1) was offered into evidence but the Board held that she was lawfully discharged prior to April 19, 1979, so she was not an employee of Ona. Vol. 7, p. 3081. The Board also held that the cards of employees Clark, Bennett and Cloud (Nos. 129, 139, 232) would not be admitted into evidence because they had not been properly authenticated. Id. at pp. 2960 & 2967. The card of Ms. Grover was excluded because she was not a member of the applicable bargaining unit. Id. at pp. 2962 & 2967
 
 
 [12]
 Federal Rule of Evidence 901(a) provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."
 
 
 [13]
 Obviously, the best method of authentication would be for each employee who signed a card to personally authenticate his own signature. But courts have allowed alternative methods of authentication. Authorization cards can be authenticated by a witness to their execution, NLRB v. Economy Ford Center, 333 F.2d 468, 471 (7th Cir.1964), or by comparison with a known specimen of the person's handwriting, NLRB v. Philamon Laboratories, Inc., 298 F.2d 176, 179-180 (2nd Cir.), cert. denied, 370 U.S. 919, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962)
 
 
 [14]
 His reliance on lists rather than actual memory was demonstrated clearly when he was asked to specify to which cards he was referring to in an earlier answer and he replied, "All on this page". Vol. III, p. 1206
 
 
 [15]
 The ALJ also states that Whorton's credibility is "crucial as to the authorization card solicitations." Vol. VII, p. 2899
 
 
 [16]
 The two discarded cards were later authenticated by the employees that signed them and are not at issue here
 
 
 [17]
 An employee who signs a card may not understand all the legal ramifications that may follow. But as the Supreme Court noted in Gissel, "We cannot agree ... that employees as a rule are too unsophisticated to be bound by what they sign unless expressly told that their act of signing represents something else." 395 U.S. at 607, 89 S.Ct. at 1939
 
 
 [18]
 
 AUTHORIZATION TO UAW
 [UAW EMBLEM] Date _________ 19__
 authorize UAW to represent
 I, ---------------------- me in collective bargaining.
 PRINT HERE
 ADDRESS - NO. STREET CITY ZIP CODE
 PHONE CLASS OF WORK HOURLY RATE DEPT. NO. SHIFT
 Employed by-----------------------------------------------------------------
 COMPANY ADDRESS
 -------------------------------- -----------------------------
 YEARS OF SERVICE SIGNATURE OF EMPLOYEE
 (OVER)
 REVERSE SIDE
 This card will be used to secure recognition and collective bargaining for the
 purposes of negotiating wages, hours, and working conditions.
 YOU HAVE THE RIGHT UNDER FEDERAL LAW TO ORGANIZE AND JOIN A UNION
 By joining the UAW you have the support of one of the world's largest Unions.
 
 
 [19]
 Similar statements were made to employees Gentle, Vol. I, p. 355, Ryan, Vol. II, p. 672, Spaits, Id. at pp. 674-676, Tunstill, Vol. III, pp. 910, 912-913, and Kennedy, Id. at p. 977
 
 
 [20]
 Similar statements were made to employee Posey. Vol. VI, p. 2874
 
 
 [21]
 In Gissel, 395 U.S. at 584, n. 5, 608, 89 S.Ct. at 1925 n. 5, 1937, the Supreme Court approved the following statements: "that the card would be used to get an election," "that [they] had the right to vote either way, even though [they] signed the card"; and "that the card would be kept secret and not shown to anybody except to the Board in order to get an election."
 
 
 [22]
 Her production percentages from March 5th through March 8th were 29 percent, 32.19 percent, 44.3 percent and 32 percent
 
 
 [23]
 Since the Union does not have majority support, we do not reach the question of whether the order should be denied enforcement because the Board did not carry out the detailed analysis mandated in such cases as Red Oaks Nursing Home, Inc. v. NLRB, 633 F.2d 503 (7th Cir.1980) and NLRB v. Gibson Products Co. Inc., 494 F.2d 762 (5th Cir.1974). Nor do we reach the question of whether General Counsel established that the "possibility of erasing the effects of past practices and ensuring a fair election ... by the use of traditional remedies ... is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order." Gissel, 395 U.S. at 614, 89 S.Ct. at 1940