# NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

# ONA CORPORATION, A DIVISION OF ONAN CORPORATION, Respondent.

## International Union, United Automobile, Aerospace and Agricultural Workers of America, Amicus Curiae.

### No. CV 84–HM–5641–NE.

United States District Court, N.D. Alabama, Northeastern Division.

March 12, 1985.

Judith M. Anderson, Thaddeus R. Sobieski, N.L.R.B., Atlanta, Ga., for petitioner.

James D. Fagan, Jr., Stanford, Fagan & Giolito, Atlanta, Ga., Joseph E. Battle, Huntsville, Ala., for amicus curiae.

John J. Coleman, J. Richard Walton, Braxton Schell, Bradley, Arant, Rose & White, Birmingham, Ala., for respondent.

## MEMORANDUM OF DECISION

HALTOM, District Judge.

This is an action brought by the National Labor Relations Board (the "Board") through its Regional Director pursuant to Section 10(j) of the National Labor Rela-

tions Act (the "Act"), 29 U.S.C. § 160(j),[1] for temporary injunctive relief pending a final decision by the Board in Case 10–CA–20287 on unfair labor practice charges filed against Ona Corporation, a division of Onan Corporation ("Ona Corporation"). The Petition for Injunction herein was filed after issuance of a complaint by the Board based upon charges filed by International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"). The Board complaint alleges in essence that Ona Corporation has engaged in, and is engaging in conduct violative of Sections 8(a)(1)[2] and 8(a)(3)[3] of the Act in that "on or about June 18, 1984, it discharged its employee Roger Armstrong because of his membership in and activities on behalf of [UAW] and because he engaged in concerted activities with other employees for the purposes of collective bargaining ...". The Petition for Injunction before this Court is predicated on the Board's conclusion that there is reasonable cause to believe that Ona Corporation has engaged in, and is engaging in, the unfair labor practices alleged in the complaint and that temporary injunctive relief in this case, including the reinstatement of Roger Armstrong, is just and proper.

Upon the issuance of an Order To Show Cause why injunctive relief should not be granted as prayed for in the Board's Petition for Injunction, Respondent Ona Corporation filed its answer herein. Respondent's answer admits the allegations of Paragraph 3 of the Petition for Injunction that on or about June 20 and July 16, 1984 UAW filed a charge and amended charge respectively in Case 10–CA–20287 alleging violation by Ona Corporation of Sections 8(a)(1) and 8(a)(3) of the Act, admits the allegations of Paragraph 4 of the Petition that following investigation and pursuant to Section 10(b) of the Act the complaint of the Board issued in Case 10–CA–20287 charging that Ona Corporation has violated and is violating Sections 8(a)(1) and 8(a)(3) of the Act, denies that the Board has reasonable cause to believe the allegations of the complaint issued by the Board attached as Exhibit 2 to the Petition, denies that Ona Corporation has engaged or is engaged in violation of Sections 8(a)(1) and 8(a)(3) of the Act as alleged in the Board's complaint, and specifically denies that injunctive relief is reasonable or appropriate in this case. Except as specifically admitted in its answer to the Petition for Injunction Ona Corporation specifically denies each of the factual allegations of the Petition.

An evidentiary hearing on the issues raised by the Petition of the Board and the answer of Respondent Ona Corporation was held in the courtroom of the Federal Courthouse in Huntsville, Alabama on September 12, 1984. The Motion To Intervene by UAW was denied. However, UAW's alternative motion to appear herein as amicus curiae was granted. All parties were afforded full opportunity to be heard, to examine and cross-examine witnesses and

---

1. 29 U.S.C. § 160(j) provides:

 The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

2. Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (1976), makes it an unfair labor practice for an employer to interfere with, restrain or coerce employees in the exercise of their rights, *inter alia,* to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection.

3. Section 8(a)(3), 29 U.S.C. § 158(a)(3) (1976), provides that:

 (a) It shall be an unfair labor practice for an employer ...
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.
 An employer violates this section when it discharges an employee because of his union activities.

to present evidence bearing upon the issues. Proposed findings of fact and conclusions of law requested by the Court were submitted by counsel for the parties herein on October 1 and 2, 1984. As authorized by Rule 52(a), Fed.R.Civ.P., the Court in this memorandum of decision incorporates its findings of fact specially and states separately its conclusions of law thereon.

## FINDINGS OF FACT

1. Respondent Ona Corporation, a division of Onan Corporation, is, and has been at all times material herein, a Delaware corporation, with an office and place of business located at Huntsville, Alabama, where it is engaged in the manufacture of gasoline and diesel engines and generators. At the time of the commission of the alleged unfair labor practices on June 18, 1984 which precipitated this litigation Ona Corporation employed approximately 700 workers at its Huntsville plant.

2. Since early April 1979 the International Union, United Automobile, Aerospace and Implement Workers of America ("UAW") has engaged in a hotly contested effort to organize the Huntsville maintenance and production employees of Ona Corporation with Roger Armstrong, a long time Ona employee, being one of the primary UAW supporters in the Ona plant from the inception of the UAW organizational activities. Armstrong has shown his support of UAW through his solicitation of authorization and membership cards, distribution of UAW literature and paraphernalia and testimony at Board hearings. His termination of employment by Ona on June 18, 1974 without doubt removed from the plant one of the inside linchpins of UAW's organizational efforts at such location.

3. Ona Corporation, the respondent in this case, was also respondent to a complaint which was the subject of the Board's Decision and Order dated May 28, 1982, and reported at 261 NLRB 1378 (1982). In this earlier case (referred to hereafter as *Ona I*), Ona Corporation, the present respondent, was found guilty of a series of individual violations of Section 8(a)(1) of the Act prior to and following a Board conducted election on June 22, 1979 at Ona's Huntsville plant facility involving International Union, UAW. In its Decision the Board concluded that Ona Corporation had committed 59 unfair labor practices during the ten-week period surrounding the Board election. Seventeen of Ona's officials, from top ranking Plant Manager Don Fore to the front-line supervisors, were found to have engaged in this employer's unlawful anti-union campaign. Ona's illegal actions were deemed to be of sufficient gravity that the Board set aside the results of the election and entered an order directing Ona to bargain with UAW. The Board found that during UAW's organizing campaign, Ona "embarked on a course of unlawful conduct calculated to destroy any majority support the Union may achieve." 261 NLRB at 1381. Part of this unlawful conduct involved threats made by Plant Manager Don Fore to move the Company's new diesel line out of Huntsville if UAW won the election. The Board concluded that Fore's threats regarding the diesel line in and of themselves had a "lingering pernicious effect" on the employees, and were of such a nature as to make "the holding of a fair election or a rerun election impossible." [4] The Board therefore concluded that

---

**4.** The Board also found that Ona violated Section 8(a)(1) of the Act by coercively interrogating employees about union activities and sympathies; threatening employees with loss of promotion if they join or support the Union; threatening to discharge employees if they join or support the Union; creating among its employees the impression that it is maintaining surveillance of their activities on behalf of the Union; threatening the employees with loss of benefits if they designate or select the Union as their collective-bargaining representative; threatening its employees with unspecified reprisals if they become or remain Union members or give support to the Union; threatening employees that they would no longer be able to bring their grievances directly to management if they select the Union; threatening employees that the Company will close the plant if they select the Union as their bargaining representative; instructing its employees not to discuss the Union with fellow employees during non-working time; threatening employees that it would

a bargaining order was necessary to protect the employees' rights.[5]

4. Shortly after the Board's decision was issued on May 28, 1982 referred to in Finding of Fact No. 3, a union membership campaign was again initiated by UAW with respect to Ona Corporation's Huntsville plant. The summer 1982 UAW membership campaign at respondent's Huntsville plant resulted in additional charges by UAW of unfair labor practices allegedly committed by Ona during such campaign. Hearings were conducted on March 15 and 16, 1983 at Huntsville, Alabama by Administrative Law Judge Pargen Robertson who on June 30, 1983 found and determined that Ona had continued to engage in unfair labor practices: (1) by refusing to bargain with UAW over certain employee grievances; and (2) by maintaining documents in an employee's personnel file identifying the employee as a "union pusher."[6] The Administrative Law Judge's ("ALJ") decision was affirmed by the Board on April 30, 1984. 270 NLRB 69 (1984) (*Ona II*).

5. In 1983 Ona Corporation continued to resist UAW's organizational efforts at Ona's Huntsville plant, which resulted in new and additional charges by UAW of unfair labor practices allegedly committed by respondent. In a Decision dated November 30, 1983 Administrative Law Judge William N. Cates found that Ona Corporation in 1983 initiated, sponsored, formed, assisted and dominated an employee labor organization at its Huntsville plant (designated "Employee Action Committee") in violation of Section 8(a)(2) and (1) of the Act. Additionally, the ALJ found that by soliciting in 1983 through a memorandum grievances from its employees concerning their jobs and working conditions and promising its employees that action would be taken regarding those grievances at a time Ona had knowledge of the Union's ongoing campaign, respondent Ona had violated Section 8(a)(1) of the Act. Judge Cate's decision is on appeal to the Board and is entitled *Ona Corporation, A Division of Onan Corporation*, JD–(Atl)–107–83 (1984) (*Ona III*).

6. On April 9, 1984 the United States Court of Appeals, Eleventh Circuit, handed down its decision in *Ona I, Ona Corporation v. N.L.R.B.*, 729 F.2d 713, enforcing in part, denying in part and remanding the case to the Board for further proceedings consistent with its opinion. While the Eleventh Circuit in this cited decision denied enforcement of the Board's bargaining order (requiring Ona to bargain with UAW without an election) and granted enforcement to that part of the Board's order which dismissed from the complaint all allegations that Ona violated Section 8(a)(3) of the Act when it discharged Dorothy Wilson, the Eleventh Circuit also enforced and upheld the Board's findings that certain employees of Ona Corporation violated Section 8(a)(1) of the Act.[7] Judgment was entered by the Eleventh Circuit Court of Appeals on May 24, 1984 and issued as a mandate on June 21, 1984. The cease and desist portion of this Eleventh Circuit

not make capital improvements at the plant if the employees select the Union as their bargaining representative; threatening to blacklist employees if they engage in activities on behalf of the Union; threatening its employees with more stringent enforcement of Company rules if they select the Union as their representatives; soliciting the grievances of employees in order to discourage activities on behalf of the Union; threatening to restrict employee movement about the plant if the Union won the election; discriminatorily enforcing its no-solicitation distribution rules in the plant in order to discourage union membership.

5. On September 12, 1982, UAW filed a petition in the United States District of Columbia Circuit for review of a portion of the Board's Order, 261

NLRB 1378 (1982). On October 1, 1982 Ona filed a petition in the Eleventh Circuit Court of Appeals for review of the Board's Order. On December 14, 1982 the Board filed a cross-application for enforcement of its Decision and Order. On February 1, 1983 all petitions relating to the Board's Decision (261 NLRB 1378) were transferred to the Eleventh Circuit Court of Appeals.

6. Roger Armstrong, who is the alleged discriminatee in the 10(j) case herein, is the employee in whose personnel file was the "union pusher" entry.

7. Actually, Ona did not in its appeal in the Eleventh Circuit contest these unfair labor practice findings of the Board.

Court judgment reads in pertinent part as follows:

"It is hereby

ORDERED AND ADJUDGED by the Court that the Petitioner, Ona Corporation, Madison, Alabama, its officers, successors and assigns, shall:

1. Cease and desist from:

(a) Interrogating employees about membership in, activities on behalf of, or desires concerning representation by International Union, United Automobile Aerospace and Agricultural Workers of America (UAW) (hereinafter called the Union).

(b) Threatening employees with loss of promotions if they join, or engage in activities on behalf of, the Union.

(c) Threatening its employees with discharge if they join, or engage in activities on behalf of, the Union.

(d) Creating among its employees the impression that it is maintaining surveillance of their activities on behalf of the Union.

(e) Threatening employees with loss of benefits if they designate or select the Union as their collective bargaining representative.

(f) Threatening its employees with unspecified reprisals if they become or remain members of the Union or give assistance or support to it.

(g) Threatening employees that they would no longer be able to bring their grievances directly to management if they designate or select the Union as their collective-bargaining representative.

(h) Threatening employees that it will close its plant if the employees designate or select the Union as their collective-bargaining representative.

(i) Instructing its employees not to discuss the Union with fellow employees during non-working time or engaging in other protected concerted activities.

(j) Threatening employees that it would not locate its new diesel plan at its Mad- ison, Alabama plant, or that it would not make other capital improvements in said plant, if the employees designated or selected the Union as their collective bargaining representative.

(k) Threatening to blacklist the employees if they engaged in activities on behalf of the Union.

(*l*) Threatening its employees with more stringent enforcement of company rules if the employees designate or select the Union as their collective-bargaining representative.

(m) Soliciting the grievances of employees in order to discourage membership in, or activities on behalf of, the Union.

(n) Threatening to restrict employee movement about the plant if the employees designate or select the Union as their collective-bargaining representative.

(o) Discriminatorily enforcing its no-solicitation and non-distribution rules in the plant in order to discourage membership in, or activities on behalf of, the Union.

(p) In any other manner interfering with, restraining or coercing employees in the exercise of rights guaranteed them by the National Labor Relations Act (hereinafter called the Act).

2. Take the following affirmative action to effectuate the policies of the Act:

(a) Post at its Madison, Alabama facility copies of the attached notice, marked 'Appendix'.[8] Copies of said notice, on forms provided by the Regional Director for Region 10 of the National Labor Relations Board (Atlanta, Georgia), after being duly signed by the Petitioner's authorized representative, shall be posted immediately upon receipt thereof, and be maintained by it for 60 consecutive days thereafter in conspicuous places, including all places where notices to employees are customarily posted. Reasonable steps shall be taken by Petitioner to insure that said notices are not

---

**8.** This notice marked "Appendix" is set out verbatim immediately following the Eleventh Cir- cuit Court cease and desist order.

altered, defaced, or covered by any other material.

(b) Notify the aforesaid Regional Director, in writing, within 20 days from the date of this judgment, what steps the Petitioner has taken to comply herewith."

## APPENDIX

### NOTICE TO EMPLOYEES

Posted Pursuant To A Judgment of the United States Court of Appeals Granting In Part, Denying In Part and Remanding In Part An Order of The National Labor Relations Board

An Agency of the United States Government

Following a hearing before an administrative law judge, the National Labor Relations Board has found that we engaged in unfair labor practices in violation of the National Labor Relations Act, as amended. The Board has ordered us to cease and desist from such conduct and to take certain affirmative action in compliance with the Order of the Board. We hereby notify our employees that:

WE WILL NOT interrogate our employees about their membership in, activities on behalf of, or desires concerning representation by International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW).

WE WILL NOT threaten our employees with loss of promotions if they join, or engage in activities on behalf of, the Union.

WE WILL NOT create among our employees the impression that we are maintaining surveillance of their activities on behalf of the Union.

WE WILL NOT threaten our employees with loss of benefits if they designate or select the Union as their collective-bargaining representative.

WE WILL NOT threaten our employees with unspecified reprisals if they become or remain members of the Union or give assistance or support to the Union.

WE WILL NOT threaten our employees that they will no longer be able to bring their grievances directly to management if they designate or select the Union as their collective-bargaining representative.

WE WILL NOT threaten our employees that we will close our Madison, Alabama plant if the employees designate or select the Union as their collective-bargaining representative.

WE WILL NOT instruct our employees not to discuss the Union with their fellow employees during nonworking time or not to engage in any other protected concerted activities.

WE WILL NOT threaten our employees that we will not locate our new diesel line at our Madison, Alabama plant, or that we will not make other capital improvements in that plant, if they designate or select the Union as their collective-bargaining representative.

WE WILL NOT threaten to blacklist our employees if they engage in activities on behalf of the Union.

WE WILL NOT threaten our employees with more stringent enforcement of company rules if the employees designate or select the Union as their collective-bargaining representative.

WE WILL NOT solicit the grievances of employees in order to discourage membership in, or activities on behalf of, the Union.

WE WILL NOT threaten to restrict employee movement about the plant if the employees designate or select the Union as their collective-bargaining representative.

WE WILL NOT discriminatorily enforce no-solicitation or no-distribution rules in the plant in order to discourage membership in, or activities on behalf of, the Union.

WE WILL NOT in any other manner interfere with, restrain or coerce our employees in the exercise of their right to engage in, or to refrain from engaging in, any and all of the activities specified in Section 7 of the Act. Those activities include the right to self-organization, to join, assist, or support unions, to bargain collectively through a representative of their

own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.

ONAN, A DIVISION OF
ONA CORPORATION *

---------------------------------------------------------
(Employer)

Dated _____ By _____
(Representative) (Title)

* Obviously incorrect. The correct name of the employer is "Ona Corporation, a Division of Onan Corporation."

---

7. In April 1984 following the April 9, 1984 release date of the Eleventh Circuit Court of Appeals' decision in *Ona I*, UAW increased the tempo of its organizational campaign at the Ona plant in Huntsville by getting employees to sign union membership cards and by distributing union caps and T-shirts. Roger Armstrong and Ezell Whorton were the leading Ona employees involved on behalf of UAW in this increased organizational effort.

8. At a quarterly meeting in early May 1984 at the Ona plant in Huntsville attended by the president and vice-president of the Company and approximately 200 Company employees, Plant Manager Don Fore publicly stated that Ona Corporation had won on all issues in the litigation against UAW in the Eleventh Circuit Court of Appeals. Ona employee Roger Armstrong, being present at the meeting, openly challenged the accuracy of Mr. Fore's representations.

9. Roger Armstrong was employed by respondent Ona as a layout inspector on first shift at Ona's Huntsville plant, work hours of which begin at 6:30 A.M. and conclude at 3:30 p.m. He started work for respondent on May 12, 1976. Except for various periods when he was laid off due to lack of work, Armstrong has worked continuously for respondent since he was hired. Throughout the period of his employment Armstrong progressed through various levels of the machine operator position before being promoted to the quality assurance department. Within quality assurance Armstrong has received several raises based on merit and at the time of his discharge was receiving the top wage scale in his category. Armstrong had been a leading union activist among Ona's employees since at least 1977. He had served as union observer in at least two Board conducted union elections, had openly sported union paraphernalia such as union hats and T-shirts, had testified against Ona in four or five unfair labor practice proceedings, had distributed union caps, T-shirts and other union paraphernalia to Ona employees during nonworking hours and had openly solicited Union authorization and Union membership cards from his fellow employees. Respondent Ona was fully aware of Armstrong's long standing and firm support of UAW's organizational efforts and activities at the Ona Huntsville plant and of his revitalized support of the Union effort following the April 9, 1984 decision in *Ona I* by the United States Court of Appeals, Eleventh Circuit.

10. While there is no direct evidence in the record showing precisely when Ona Corporation was apprised of the April 9, 1984 decision by the Eleventh Circuit Court of Appeals in *Ona I*, this Court by reasonable inference from the evidence adduced concludes and finds that Ona Corporation and its management staff at the Huntsville plant were fully aware of such decision and the import thereof on or before April 15, 1984.

11. On June 18, 1984 employee Roger Armstrong was fired by respondent Ona Corporation for conduct which respondent claims constituted insubordination. Armstrong arrived at work on the day in ques-

tion about 6:00 A.M. carrying a sack containing UAW T-shirts. He came into the plant with Ezell Whorton, another known UAW activist. Armstrong went straight to his work area and to his workbench. He set the sack down on his workbench, with one or more loose T-shirts on top. The Union emblem was showing. Armstrong sat down and began drinking coffee. Ezell Whorton was on the other end of the workbench. Ron Polk (Ona Personnel Relations Manager), James Wallace (machine operator, first shift) and Robert Stewart (third shift inspector) were in the immediate area at this time. Armstrong saw Polk when he (Armstrong) first entered the work area, saw Polk leave the area, talk briefly on the phone at the expeditor's desk, and then return to Armstrong's work area with another person. When Armstrong placed the sack containing the T-shirts on his work table, one T-shirt fell off into an ashtray. Armstrong picked the shirt up, shook the ashes off and laid the shirt back on top of the sack. About the time Armstrong put the T-shirt down, Ona Personnel Relations Manager Ron Polk walked up with Steve Todd (third shift superintendent). The two men came up to Armstrong. Ron Polk said to Armstrong: "Get that damn shit off that desk." Armstrong replied: "Are you talking to me"? Polk pointed at the T-shirt sack and said to Armstrong: "I said get that damn shit off that desk." Armstrong picked up the sack with the T-shirts on it and put it on his personal tool box. Armstrong then went to sit back down at the workbench. Polk came behind Armstrong, grabbed the T-shirt sack up, shoved it into Armstrong's gut, threw the sack back on the work table, put his finger in Armstrong's face and again told Armstrong that he (Polk) had told him (Armstrong) "to get that shit out of here." Armstrong thereupon picked the T-shirt sack up again and told Polk that he had a legal right to have that material in the plant. Armstrong then placed the T-shirt sack back on the tool box. Ron Polk thereupon told Armstrong that he, Armstrong, was going to be guilty of insubordination if he didn't get that "damn stuff" out of the plant.

Armstrong then got his toolbox and asked Polk if Polk wanted him to put the toolbox in the aisle. Polk replied "no" and again instructed Armstrong to "get that out of here." Armstrong then inquired of Polk if he, Polk, was counting everything from the highway this way as a work area. Polk replied: "That's right." Armstrong then replied: "Mr. Polk, I don't know what to do with it then." Armstrong had no locker in which to store the sack and T-shirts. Polk then grabbed the T-shirt sack up, put it under his arm, and told Armstrong to follow him to his office. Armstrong then inquired of Polk if he (Armstrong) could have a UAW representative there to represent him. Polk replied: "No, sir." Armstrong testified that when Polk was telling him to remove the UAW T-shirts from his work area that Polk was screaming and hollering and cussing. Polk, Todd and Armstrong went into Ron Polk's office. The hour was 6:15 A.M. As the three men entered Polk's office, Polk turned to Steve Todd (third-shift superintendent) and told him to sit down and keep his damn mouth shut. Polk turned and walked out of his office. Around 6:30 P.M. Charlies Gatewood (first shift superintendent) came into Polk's office. Roger Armstrong advised Gatewood to get somebody to cover his (Armstrong's) department because he (Armstrong) thought Ron Polk was going to fire him. Gatewood replied that the matter had already been taken care of. About 9:20 A.M. Ron Polk came back into the office, called Steve Todd (third shift superintendent) and Charlie Gatewood (first-shift superintendent) outside of his office for just a minute to talk to them, and then came back into his office and sat down at his desk. Polk thereupon said to Armstrong: "Mr. Armstrong, we're to pay you for the remainder of the day throughout the day. Steve Todd and Charlie Gatewood (are) going to escort you back to your work area where you can pick up all of your personal belongings, including your toolbox. And then they'll escort you to the guard shack. And I'll call you later on the phone to inform you whether to return to work tomorrow morning or not." Polk did

call Armstrong about 3:30 or 4:00 o'clock that afternoon and told him that as of their conversation that morning that he (Armstrong) was terminated from Ona Corporation for insubordination.

12. The hour of 6 A.M. was Armstrong's usual time of arrival for work at the Ona plant in Huntsville, but he did not punch in on the timeclock until some time between 6:15 A.M. and 6:30 A.M. The third shift of work ended at 6:30 A.M. and the first shift (Armstrong's shift) began at 6:30 A.M. Armstrong and his fellow employees on a regular basis ate their breakfast in their work area prior to commencement of work at 6:30 A.M. and there is no evidence in the record that such a practice was prohibited by the respondent company. The evidence here shows that on the morning of June 18, 1984 between the hours of 6:00 A.M. and 6:30 A.M. Armstrong was inside the Ona plant and in his assigned work area eating breakfast before work as he regularly and customarily did. Admittedly at this time he had in his possession certain pro-union materials in the form of UAW T-shirts contained in a sack which he had brought into the plant that morning. However, there is no evidence in this record that Armstrong passed these T-shirts out or even attempted to pass them out. There is much evidence in this record, however, which shows without contradiction other Ona employees on numerous occasions prior to June 18, 1984 brought into the Ona plant in Huntsville and kept at their desks or work areas, even during work hours, personal items including sacks of clothing, magazines, home grown vegetables and home baked goods. Often employees bringing food into the plant arranged the food on the individual employee's table and encouraged supervisors and co-employees to partake of the food during working hours. Some Ona employees even sold candy, radios, tools, caps, T-shirts, belts, billfolds and cosmetics inside the plant. In short, this evidentiary record shows that on and long prior to the time of Armstrong's termination on June 18, 1984 Ona employees were permitted by their employer to possess and keep virtually all types of personal items at their work stations inside the Huntsville plant, including Union paraphernalia.

13. While the solicitation of Union membership or authorization cards has been a periodic and episodic Union activity in the Huntsville plant of Ona Corporation since the end of the 1979 organizational campaign, the evidence here shows that shortly following the issuance of the April 9, 1984 decision of the Eleventh Circuit Court of Appeals in *Ona I* there was renewed interest in the UAW organizational effort on the part of Ona employees. They requested UAW hats, buttons, and T-shirts. 100 to 125 hats were distributed. About 50 UAW T-shirt were handed out. In fact, there was a substantial solicitation of Union membership cards underway at the Ona Huntsville plant at the time of Roger Armstrong's termination and Roger Armstrong was an important part of such solicitation effort along with Ezell Whorton. These two men contributed the backbone of the UAW organizational effort at Ona Corporation. In June 1984 down to June 18, 1984 (date of Armstrong's discharge) the two men turned in approximately 25 to 26 signed Union membership cards from employees of Ona Corporation. Since Roger Armstrong's termination on June 18, 1984 to the date of the hearing of this cause on September 12, 1984 the UAW Union had received only one signed membership card from Ona employees. Since Armstrong was fired on June 18, 1984 there have been no requests from Ona employees for UAW T-shirts, hats, buttons or Union paraphernalia of any type.

The week prior to Armstrong being fired by Ona Corporation there were approximately 80 employees throughout the Ona plant in Huntsville wearing Union (UAW) hats. The number dwindled from 80 to 5 the first week after such firing. At the time of the September 12, 1984 bench hearing only one Ona employee wore a Union (UAW) hat. Of the 22 employees in Roger Armstrong's department 7340 there were approximately 18 employees wearing Union (UAW) hats the day prior to the firing of

Armstrong, dropping to 4 the day following such firing. One employee in Armstrong's department who had worn a UAW hat at work since UAW started organizing in 1979 stopped wearing his UAW hat about a week and one-half before the hearing, leaving only one employee in the entire plant wearing a UAW hat at the time of the hearing.

14. Prior to his discharge on June 18, 1984 Roger Armstrong had never been reprimanded or disciplined by Ona Corporation for his long continued and visible Union activities. In fact he had advanced in position at Ona, having received his most recent promotion approximately one year prior to the bench hearing in this case. In 1977 or 1978 an Ona supervisor did write the notation "union pusher" on a layoff slip in Armstrong's personnel file but there is no evidence of such notation being used against Armstrong prior to the June 18, 1984 termination date.

15. The Court draws and reaches what it considers is a rational and reasonable inference from the testimony and exhibits in this case that Ona's discharge of Roger Armstrong on June 18, 1984 has led to an appreciable and substantial diminution in Ona employee support for UAW.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter of this proceeding and is empowered to grant injunctive relief. 29 U.S.C. § 160(j).

2. The test for determining the propriety of temporary relief against a party allegedly committing unfair labor practices pending final disposition of charges by the National Labor Relations Board (Board) is whether the Board has reasonable cause to believe that unfair labor practices have occurred, and whether injunctive relief is equitably necessary or just and proper. *Boire v. International Brotherhood of Teamsters*, 479 F.2d 778 (5th Cir. 1973); *Boire v. Pilot Freight Carriers,*

*Inc.*, 515 F.2d 1185 (5th Cir.1975).[9] The first question requires the Board to sustain a minimal burden of proof, but the second demands some exercise of discretion on the part of the trial judge. *Boire v. Pilot Freight Carriers, Inc., supra,* at 1189.

3. Section 10(j) of the National Labor Relations Act authorizing the regional director to apply to the district court for a temporary injunction in unfair labor practice cases to preserve status quo pending NLRB procedures mandates considerable deference by the district court to the regional director's decision to petition for temporary relief. *Boire v. International Brotherhood of Teamsters, supra,* at pp. 803–804.

4. In determining whether reasonable cause exists to believe that unfair labor practices have been committed, the district court need only decide that the Board's theories of law and fact are not insubstantial or frivolous. *Boire v. Teamsters, supra; Boire v. Pilot Freight Carriers Inc., supra.* Respondent Ona Corporation properly concedes in brief and the Court finds from this evidentiary record that the Board, through its Regional Director, has reasonable cause to believe that the June 18, 1984 discharge of Roger A. Armstrong by Ona Corporation violated Section 8(a)(1) and (3) of the Act. The evidence here shows that Armstrong and his fellow employees on a regular basis ate their breakfast in their work area prior to commencement of work when their work shift began. There is no evidence in the record that such practice was prohibited by the Company. Thus, it appears clear that on the morning in question Armstrong was engaging in a protected activity by his mere possession of Union materials in his work area. There is no evidence that Armstrong on the morning in question distributed or attempted to distribute any Union material. Thus, there is reasonable cause to believe that Armstrong was protected

---

**9.** Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are binding upon the district courts in the Eleventh Circuit unless and until they are overruled by the Eleventh Circuit sitting en banc. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

under the Act from retaliation due to his possession of the Union T-shirts on the occasion in question and that any attempt to deprive him of this protected right was an unfair labor practice.

■ The record also supports reasonable cause to believe that Armstrong's discharge violated the Act on the alternative theory that the Company enforced its rules against Armstrong in a discriminatory manner. See *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047 (2nd Cir.1980); *Head Division, Amf., Inc. v. N.L.R.B.*, 593 F.2d 972 (10th Cir.1979); *Midwest Regional Joint Board v. N.L.R.B.*, 564 F.2d 434 (D.C.Cir.1977). The uncontradicted evidence shows that Ona employees have been permitted to keep at their work stations sacks of clothing and food (Tr. 62, 64, 66), magazines (Tr. 67), home baked goods (Tr. 67), candy (Tr. 67), radios (Tr. 68), tools (Tr. 68), caps (Tr. 68), T-shirts (Tr. 69), belts (Tr. 69), and other personal items (Tr. 69). The uncontradicted evidence further shows that on numerous occasions prior to June 18, 1984 that other Ona employees had Union (UAW) materials on their bodies or in their possession inside the plant in working areas during working times without being charged with infraction of Company rules.

5. The cease and desist order of May 24, 1984 entered by the Eleventh Circuit Court of Appeals in *Ona I* in part orders Ona to refrain from:

(*o*) Discriminatorily enforcing its no solicitation and no distributing rules in the plant in order to discourage membership in, or activities on behalf of, the Union.

The discharge of Armstrong on June 18, 1984 was in apparent disregard of the cease and desist order above set out, particularly in light of the admitted fact that Ona openly permitted the Employee Action Committee to distribute its literature in the work areas of Ona's Huntsville plant (*Ona III*). Moreover, this unlawful conduct of Respondent in discharging Armstrong, occurred almost immediately following the Eleventh Circuit Court's entry of its order and judgment in *Ona I*. As suggested by

UAW's amicus curiae brief, "The Company's action in discharging the Union's most vocal supporter in open defiance to the court's order 'speaks louder' than any notice that the Employer may post."

6. This record shows that the Ona employees at the Huntsville, Alabama plant have been repeatedly subjected to proven unfair labor practices by Ona throughout UAW's attempt to organize the Ona plant. Ona repeatedly violated Section 8(a)(1) (set out in footnote 2, ante) of the National Labor Relations Act during the ten-week period surrounding the Board conducted election on June 22, 1979. The National Labor Relations Board issued an order on May 28, 1982 affirming the ALJ's findings that Ona had violated § 8(a)(1) of the Act (*Ona I*). On appeal to the Eleventh Circuit Court of Appeals *Ona did not contest the Board's findings that certain conduct on the part of its employees violated Section 8(a)(1) of the Act. 729 F.2d 713 at 726.* An examination of the cease and desist portion of the Eleventh Circuit Court of Appeals judgment on May 24, 1984 in *Ona I*, ante, reveals that respondent at the outset of this bitter labor-management controversy engaged in egregious and extensive proven unfair labor practices. Thereafter, this respondent, upon rejuvenation of UAW's organizing efforts in the spring of 1983, set up an illegal 8(a)(2) labor organization in an obvious effort to erode UAW's support among the Ona employees. Administrative Law Judge Cates has entered an order finding this conduct to be violative of §§ 8(a)(1) and (2) of the Act (*Ona III*). Similarly, this employer has been found guilty of maintaining documents in Roger Armstrong's personnel file identifying him as a "union pusher." This conduct by Ona has been found by the Board to constitute an 8(a)(1) violation (*Ona II*). Finally, when UAW again attempted to revive its efforts to organize the Ona employees at Huntsville following the Eleventh Circuit's encouraging April 9, 1984 decision in *Ona I*, this respondent has discharged UAW's leading union activist at its Huntsville plant for a patently unlawful reason. The

employees at Ona have undoubtedly taken this discharge of the Union's inside linchpin as a warning that if they choose to support and deal with the Union, as has Armstrong, they risk severe Company retaliation. Moreover, Ona's discharge of Roger Armstrong on June 18, 1984 has led to an appreciable and substantial diminution in Ona employee support for UAW (Finding of Fact 15, ante).

 7. While the law of the Eleventh Circuit cautions restraint in the issuance of § 10(j) injunctions due to the extraordinary nature of the relief, it is also the law of this Circuit that § 10(j) relief is appropriate when an employee or union has committed such egregious unfair labor practices that any final order of the Board will be meaningless or so devoid of force that the remedial purposes of the Act will be frustrated. *Boire v. Pilot Freight Carriers, Inc.,* 515 F.2d 1185, 1192 (5th Cir.1975). Under the circumstances of this case, the revival of UAW's organizing campaign at the Ona plant in Huntsville will be virtually impossible unless Respondent's employees are given an affirmative signal that further union activity will not cause the kind of Company retaliation that has occurred in the past. Maintenance of the status quo is at least one consideration that should enter the § 10(j) equation. *Id.* at 1193. On the basis of this record, which paints a background picture of massive and coercive unfair labor practices committed by respondent throughout UAW's efforts to organize the maintenance and production employees of Ona Corporation, this Court concludes and finds that respondent's action in unlawfully discharging Roger Armstrong was egregious conduct committed by respondent for the deliberate purpose of stamping out union support among its employees. In this particular factual situation, the reinstatement of an unlawfully discharged union supporter, namely Roger Armstrong, is clearly "just and proper" and is equitably necessary to restore the status quo. *Kaynard v. Palby Lingerie, Inc.,* 625 F.2d 1047 (2nd Cir.1980); *Boire v. Pilot Freight Carriers, Inc., supra.* Absent injunctive relief, the basic remedial purpose of the

Act might be frustrated in the instant case. It is therefore necessary that employee Roger Armstrong be forthwith reinstated by the Respondent Ona Corporation pending resolution of the matter by the Board.

An appropriate injunctive order will issue requiring Roger Armstrong's immediate and full reinstatement by respondent to his former position, or, if that position no longer exists, to a substantially equivalent position without prejudice to his seniority and other rights and privileges. Mr. Armstrong is due to be reinstated at the wage and fringe benefit levels at which he would now be if he had not been discharged. Back pay is a form of final relief and it should be for the Board to decide whether it is appropriate in this case.

The Court's injunctive order in this case will further provide that pending the final disposition of the matters herein involved pending before the Board, that respondent, its officers, representatives, agents, successors and assigns be enjoined and restrained from commission, continuation or repetition of any acts in violation of Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act.