Harold A. BOIRE, Regional Director of Region 12 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Plaintiff-Appellant-Cross-Appellee.

v.

PILOT FREIGHT CARRIERS, INC., et al., Defendants-Appellees-Cross-Appellants.

No. 74–2899.

United States Court of Appeals, Fifth Circuit.

July 16, 1975.

Rehearing and Rehearing En Banc Denied Oct. 17, 1975.

See 521 F.2d 795.

Elliott Moore, Deputy Associate Gen. Counsel, Marvin Roth, William R. Hayden, Deputy Asst. Gen. Counsels, N.L. R.B., Abigail Cooley, Washington, D. C., Charles I. Cohen, Charles Deal, John C. Wooten, Attys., N.L.R.B., Tampa, Fla., for plaintiff-appellant-cross-appellee.

L.N.D. Wells, Jr., Dallas, Tex., for Truck Drivers, Local Union 512.

James Blue, James Facciolo, Miami, Fla., Ronald D. McCall, Granville M. Alley, Jr., Tampa, Fla., for defendants-appellees-cross-appellants.

Before GEWIN, AINSWORTH and MORGAN, Circuit Judges.

GEWIN, Circuit Judge:

This appeal involves the second occasion on which the Regional Director of the NLRB has sought § 10(j) relief in a Florida labor dispute between Pilot Freight Carriers, Inc. (Pilot) and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Teamsters). Section 10(j) of the Taft-Hartley Act authorizes the NLRB to seek temporary injunctive relief against a party allegedly committing unfair labor practices pending final disposition of the charges by the Board. 29 U.S.C. § 160(j).

The prior proceeding was aimed at the Teamsters, to keep the union from forcing Pilot to bargain before the legal questions could be determined by the Board. The district court granted relief, and we affirmed. Boire v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, 479 F.2d 778 (5th Cir. 1973) (hereinafter cited as Boire v. Teamsters). This case presents the reverse side of the coin, for here the Regional Director seeks temporary relief against Pilot and its dock contractor, BBR of Florida, Inc. (BBR) for claimed coercive tactics designed to impede the employees' organizational efforts. The district court granted the de-

sired relief in part, denied it in part, and we affirm.

Writing on a virtual *tabula rasa*, the Boire v. Teamsters decision, *supra*, set the boundaries of § 10(j) relief in this circuit. Though Judge Goldberg's scholarly opinion has indeed charted our general course, we nonetheless find it necessary to navigate some hitherto unexplored inlets within the "broad harbor" of § 10(j).

Section 10(j) of the Taft-Hartley Act reads as follows:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged or is engaging in an unfair labor practice, to petition any United States district court . . . for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief as it deems just and proper. 29 U.S.C. § 160(j).

The provision was enacted in 1947, despite Congress' general aversion to labor injunctions. In the fifteen years following passage of the Norris-LaGuardia Act, it had become evident that normal NLRB machinery—involving issuance of an unfair labor practice complaint, a hearing before a trial examiner, de novo review by the Board, and an enforcing order by a Court of Appeals—was so time-consuming that guilty parties could violate the Act with impugnity during the years of pending litigation, thereby often rendering a final order ineffectual or futile. *See* Note, 44 N.Y.U.L.Rev. 181 (1969); Note, 45 Texas L.Rev. 358 (1966). Congress therefore gave the labor board a discretionary tool to prevent erosion of the status of the parties pending its final decision.

In an effort to further the principles underlying § 10(j), courts have fashioned a bipartite test for determining the propriety of temporary relief: (1)

whether the Board, through its Regional Director, has reasonable cause to believe that unfair labor practices have occurred, and (2) whether injunctive relief is equitably necessary, or, in the words of the statute, "just and proper." Boire v. Teamsters, *supra* ; NLRB v. Aerovox Corp. of Myrtle Beach, 389 F.2d 475 (4th Cir. 1967); Minnesota Mining and Manufacturing Co. v. Meter, 385 F.2d 265 (8th Cir. 1967); Angle v. Sacks, 382 F.2d 655 (10th Cir. 1967). The first question requires the Board to sustain a minimal burden of proof, but the second demands some exercise of discretion on the part of the trial judge.

## I. Reasonable Cause to Believe

 In determining whether reasonable cause exists to believe that unfair labor practices have been committed, the district court need only decide that the Board's theories of law and fact are not insubstantial or frivolous. Boire v. Teamsters, *supra* ; Samoff v. Building and Construction Trades Council, 475 F.2d 203 (3d Cir. 1973); San Francisco-Oakland Newspaper Guild v. Kennedy, 412 F.2d 541 (9th Cir. 1969); Schauffler v. Local 1291, 292 F.2d 182 (3d Cir. 1961); *but see* Danielson v. Garment Workers, 494 F.2d 1230 (2d Cir. 1974). The Court of Appeals, in turn, reviews the trial court's factual determinations for clear error and its legal conclusions to determine whether they are correct. Boire v. Teamsters, *supra* at 793. Whether reasonable cause exists, of course, depends upon the facts of a particular case. The scenario pertinent to our decision began shortly after the last Fifth Circuit opinion, in which the relevant facts were copiously detailed. 479 F.2d at 782–86. Briefly, however, some background information is necessary to put the present dispute in perspective. In 1970 the Interstate Commerce Commission granted Pilot Freight Carriers, Inc., a North Carolina corporation, the authority to extend its freight operations as far south as the Florida Keys. Pilot promptly established terminals in Jacksonville, Tampa, Hollywood and Orlando.

It did not, however, employ its labor force directly, but instead commissioned men who owned their own trucks, appropriately called owner-operators, to haul freight in the Florida area. Pilot also commissioned dock contractors, who were responsible for hiring dockworkers. Since 1964 Pilot had been a member of the National Master Freight Agreement, and most of Pilot's employees in other areas of the country were Teamsters. The Teamsters took the position that the Florida operations were an accretion to the pre-existing National Master Freight Agreement, so Pilot's new employees were governed by its terms. Pilot disagreed and filed unfair labor practice charges against the Teamsters for their allegedly illegal organizational activities. In the meantime, a unit clarification petition had been filed to determine the accretion question. The Regional Director petitioned the district court for § 10(j) relief against the Teamsters pending final Board determination of the unfair labor practice charges. As mentioned above, we affirmed the district court's grant of relief.

Subsequent to our decision in Boire v. Teamsters, *supra*, the Board announced its decision in the unit clarification dispute. Released January 31, 1974, the NLRB made four important determinations: (1) the Florida operation was not an accretion to the national bargaining agreement, (2) the owner-operators were employees of Pilot, despite the company's assertions of independent contractor status, (3) Pilot and the dock contractors were joint employers of the dockworkers, and (4) "each of the Florida terminals or the 4 terminals together, may constitute an appropriate unit." Pilot Freight Carriers, Inc. and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, 208 NLRB No. 138, 1974 CCH NLRB ¶ 26,200.

The Board's decision on the accretion issue spurred the Teamsters to immediate organizing at the Jacksonville terminal. The union's efforts were not limited to owner-operators, but also included the dockworkers who worked on the same premises.

The first employee to sign a union card was Melvynn Johnston, a dockworker. He testified that he signed on February 5, 1974 and sponsored a meeting the next day to convince others to join the Teamsters. Johnston was fired on February 7 by the president of BBR who refused to give any reason for the dismissal.[1] Clarence Brace, one of the first people Johnston solicited concerning the union, testified that he signed a union card on February 6 and was fired on February 7.

Shortly after the discharges, "no solicitation—no distribution" signs appeared in the employee lounges of the Jacksonville terminal, along with large octagonally shaped "stop" signs that cautioned employees to think before signing union cards. Management of Pilot and BBR continually voiced their opposition to the Union. There was evidence that the president of BBR promised to fire any employees whom he found had signed union cards, though he denied making such statements. Pilot's president and vice-president gave one "captive audience" speech in which they told the drivers that if the union proved successful, the men would no longer be able to drive their own trucks. Instead, they would have to use company equipment, and the company would not purchase their trucks from them. The speech caused grave concern among the owner-operators who had made substantial investments in their equipment. Pilot personnel added that they would continue to treat the drivers as "independent businessmen", despite the NLRB's ruling that they were employees. Management spokesmen for the freight company said they could not afford union wages or collateral union benefits, and the president of BBR stated flatly that the union would break him.

During the second week in February Pilot granted pay increases to the over-the-road and city drivers. The impetus for the wage hikes is hotly contested, as Pilot maintains they were instituted in response to a mandatory ICC ruling that an increased fuel surcharge be passed on to the drivers who would pay for fuel. There were, however, additional wage increases in the course of the organizational drive that were inaugurated by Pilot without federal pressure. Pilot also began to allow "double runs", i. e. two men riding in a truck at the same time, thereby increasing the mileage an employee could cover in a given period of time. Again, Pilot maintains that it initiated the double runs at the drivers' behest, because they felt endangered by other operators out on strike. There was evidence, however, from which the Regional Director could conclude that the double runs were a benefit instituted by management to undermine union strength.

Despite management's antagonism to unionization, the employees continued to hold organizational meetings off company property. Growing numbers signed authorization cards, and on February 13 the union announced it had majority support and requested Pilot to bargain. Pilot personnel repeatedly refused.

Based on this evidence, the district court determined that the Board had

1. Johnston testified concerning the circumstances of his discharge:

A. He [the President of BBR] said, "Mel, the reason I called you tonight," he says, "there won't be any need for you to come to work tonight."

And I asked him why. He said, "I'm firing you."

Q. What did you say, if anything, when he said that?

A. I asked him if he was going to give me a reason for firing me. And he said that he didn't have to give me "any goddamm reason."

Q. And what did you say to that, if anything?

A. I asked him if he knew what he was doing. And he says, "Yeah. You know more about what's going on around here than I do." So—

Q. Can you recall anything else that was said in that conversation?

A. I asked him again if he was going to give me a reason for firing me. And he said that he didn't owe me any reason and that he wasn't going to give me one.

(Transcript of 10(j) hearing at 90).

reasonable cause to believe that Pilot and BBR had violated §§ 8(a)(1), 8(a)(3) and 8(a)(5) of the National Labor Relations Act.[2] § 8(a)(1) declares that an employer commits an unfair labor practice when he interferes with, restrains, or coerces employees in the exercise of the right to choose a bargaining agent, while § 8(a)(3) prohibits discriminatory discharges, and § 8(a)(5) proscribes employer refusals to bargain. 29 U.S.C. §§ 158(a)(1), (3), and (5).

■■ Despite the testimony chronicled above, Pilot contends the district court lacked authority to make a reasonable cause finding. The employer strenuously asserts that the district court had no evidence on which to base its conclusion that Pilot and BBR are joint employers, thereby making each responsible for the unfair labor practices of the other. Specifically, Pilot argues that since BBR was not Pilot's dock contractor at the time the NLRB considered the unit clarification petition, the district court erroneously relied on the Board opinion to conclude Pilot and BBR were joint employers. We recognize the fact, of course, that the Board decision has no res judicata or collateral estoppel effect—because the parties to the two proceedings were different. Yet the Board spoke in general terms of the dock contractors as a class and found that Pilot personnel directed and supervised the activities of the dockworkers. 1974 CCH NLRB ¶ 26,200 n.14. The record before the district court in the instant case contains similar independent evidence that BBR employees received their instructions on how to fuel the trucks from Pilot dispatchers. Though the dockworkers were hired and paid by BBR, both sets of employees worked on the same premises and enjoyed the same lounge area. Dockworkers ostensibly employed by BBR received notices from management in Pilot envelopes. The president of BBR met with Pilot's counsel to discuss the proper scope of speeches he would deliver to the dockworkers concerning unionism. In these circumstances, the district court's conclusion that there was reasonable cause to believe Pilot and BBR were joint employers was not erroneous.

■■ Pilot attacks many of the other grounds relied upon by the Board for potential unfair labor practices. The employer, for example, claims its motives for the wage increases were pure, the no solicitation rule was legal, the captive audience speeches were within proper bounds, it did not illegally refuse to bargain, etc. Pilot's assertions, however, misconstrue our role. It is not our duty at this juncture to pass upon whether violations have been established by a preponderance of the evidence, but merely to decide that the Board's theories are substantial and not frivolous. Boire v. Teamsters, *supra.* We, and the district court, would usurp the Board's statutory powers if we attempted to rule on the unfair labor practice charges. We simply hold that the trial court's factual findings were not clearly erroneous and its legal conclusions were correct. The Board had reasonable cause to believe that Pilot and BBR were committing violations of §§ 8(a)(1), 8(a)(3) and 8(a)(5).[3]

**2.** Specifically, the district court found reasonable cause to believe Pilot and BBR had engaged in various activities to thwart union membership:

 a. threatening the employees with financial loss if they selected the Union;

 b. increasing compensation to the over-the-road and local drivers;

 c. stating that other increases were being withheld because of the labor dispute with the union;

 d. promising the use of Pilot's equipment if drivers would return to work;

 e. allowing certain over-the-road trips to be made with two drivers instead of one, thus substantially increasing the pay of each;

 f. informing employees that 10 million dollars had been reserved to keep the Union from organizing Pilot's Florida employees; and

 g. discharging employees Roy Brace and Melynn (sic) Johnston for their union activities.

**3.** We note that the Board has recently determined that a § 8(a)(5) violation is not a prerequisite to a bargaining order where the employ-

## II. Equal Necessity

■ Having determined the record before the district court contains substantial evidence to support its finding of reasonable cause, we must now delimit the breadth of relief a district court may order under § 10(j). The statute allows "such temporary relief or restraining order as it [the district court] deems just and proper," 29 U.S.C. § 160(j), a requirement we have given the shorthand label "equitable necessity." Boire v. Teamsters, *supra*. This second prong of the § 10(j) test thus confers a certain range of discretion upon the trial court, reviewable for abuse. Boire v. Teamsters, *supra* ; Danielson v. Local 275, 479 F.2d 1033 (2d Cir. 1973); Minnesota Mining and Manufacturing Co. v. Meter, *supra*.

In the present case the district court enjoined Pilot and BBR from violating §§ 8(a)(1), 8(a)(3), and 8(a)(5) in the future—through such activities as financial inducements not to join the union, threats of economic reprisals, discriminatory discharges, and other methods of interfering with employees' organizational rights. The court refused, however, to order mandatory injunctive relief in the form of temporary reinstatement or a temporary bargaining order. It focused on the distinction between prohibitory and mandatory injunctive remedies, reasoning that a majority of courts have denied mandatory relief because it usurps the Board's powers and prerogatives.

■ Section 10(j) is itself an extraordinary remedy to be used by the Board only when, in its discretion, an employer or union has committed such egregious unfair labor practices that any final order of the Board will be meaningless or so devoid of force that the remedial purposes of the Act will be frustrated. Wilson v. Milk Drivers and Dairy Employees Union, Local 471, 491 F.2d 200 (8th Cir. 1974); UAW v. NLRB, 145 U.S.App.D.C. 384, 449 F.2d 1046 (1971); Angle v. Sacks, 382 F.2d 655 (10th Cir. 1967). Proper composition of the bargaining unit, reinstatement of unlawfully discharged employees, and certification of the union as bargaining representative are matters generally left to the administrative expertise of the Board. We believe that measures to short-circuit the NLRB's processes should be sparingly employed. While it is true Congress implemented § 10(j) to aid the Board in administration of national labor policy, its scope should not overpower the Board's orderly procedures. Moreover, though traditional rules of equity may not control the proper scope of § 10(j) relief, some measure

---

er's independent § 8(a)(1) or § 8(a)(3) violations are so substantial as to undermine the union's majority status. Steel-Fab, Inc., 221 NLRB No. 25, 1974 CCH NLRB ¶ 26,674. A majority of the NLRB has also ruled that when an employer has violated § 8(a)(1) or § 8(a)(3), but not § 8(a)(5), his duty to bargain does not arise until the Board affirms the administrative law judge's determination that a bargaining order is appropriate. Elm Hill Meats, 213 NLRB No. 100, 1974-75 CCH NLRB ¶ 15,062.

Thus, it might be argued that our finding of reasonable cause to believe Pilot and BBR have violated § 8(a)(5) is superfluous. Our response, however, is severalfold. First, Board law at the time the district court entered its order required a refusal-to-bargain finding in order to begin analysis of whether a *Gissel* order should follow. *See* Steel-Fab, *supra;* NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1818, 23 L.Ed.2d 547 (1969). Second, the Board's recent interpretation of *Gissel*, in

*Steel-Fab* and *Elm Hill Meat,* has not been through the crucible of Supreme Court scrutiny to determine its validity. Third, and perhaps most important, our function in this 10(j) proceeding is not to determine whether a violation of the Act has occurred; we need not reconcile the niceties of prior Board practice, approved by the Supreme Court, with its recent declarations. We only decide that the Board *might* find a violation of § 8(a)(5) independent of §§ 8(a)(1) and 8(a)(3), i. e. that its position is not insubstantial or frivolous. Fourth, in view of our disposition of the interim bargaining issue, *infra,* a finding of reasonable cause to believe the employers have violated § 8(a)(5) is not crucial to the case. It simply supplies analytical clarity.

Therefore, whether § 8(a)(5), or § 8(a)(1) and/or § 8(a)(3) standing alone provide the catalyst for a bargaining order, the Board has demonstrated reasonable cause to believe the Act has been violated.

of equitable principles come into play. *Compare* NLRB v. Aerovox Corp., 389 F.2d 475 (4th Cir. 1967) and Minnesota Mining and Manufacturing Co., *supra, with* McLeod v. General Electric Co., 366 F.2d 847 (2d Cir. 1966), vacated 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967) and Danielson v. Garment Workers, 494 F.2d 1230 (2d Cir. 1974). If the trial court, in its discretion, does not believe that far-reaching mandatory relief would serve the purposes of the Act, it need not grant the full remedy requested by the Board. The Chancellor does not abdicate his powers merely upon a showing that the Regional Director's theories surpass frivolity. *See* Danielson v. Garment Workers, *supra.* He maintains some power to do equity and mold each decree to the necessities of the case.

 Here the district court has prohibited Pilot and BBR from committing any unfair labor practices *in futuro*, pending final determination of the charges before the Board. Although a decree enjoining a party from violating the law might appear superfluous at first blush, we believe the order adequately protects the interests of the union, since the employers can be held in contempt if they try to dissipate union strength in any unlawful manner.

 Nor did the district court abuse its discretion in failing to order reinstatement of the two employees arguably discharged for union activity. The Board waited three months before petitioning the district court for temporary relief. Although the time span between commission of the alleged unfair labor practices and filing for § 10(j) sanctions is not determinative of whether relief should be granted, it is some evidence that the detrimental effects of the discharges have already taken their toll on the organizational drive. It is questionable whether an order of reinstatement would be any more effective than a final Board order at this point. *See* Note, 44 N.Y.U.L.Rev. 181, 197 (1969); *contra* Angle v. Sacks, 382 F.2d 655 (10th Cir. 1967); Davis v. LeTourneau, 340 F.Supp. 882 (E.D.Tex.1971).

Whether these employees were in fact dismissed for their organizational efforts will be determined by the Board when it brings the full panoply of its resources to bear upon issuance of the final order; the issues are now well preserved for its review. *See* Boire v. Teamsters, *supra.*

 To require interim bargaining pending final determination of the union's representative status would prove even more problematical. Here the parties have never enjoyed a bargaining relationship. The union claimed to have a card majority, but no certification election has been held. Maintenance of the status quo is at least one consideration that should enter the § 10(j) equation. Minnesota Mining and Manufacturing Co. v. Meter, *supra;* Schauffler v. Local 1291, *supra;* Brown v. Pacific Telephone and Telegraph Co., 218 F.2d 542 (9th Cir. 1955). As stated by Senator Taft in explaining the purpose of the legislation:

> Experience under the National Labor Relations Act has demonstrated that by reason of lengthy hearings and litigation enforcing its orders, the Board has not been able in some instances to correct unfair labor practices until after substantial injury has been done. Under the present act the Board is empowered to seek interim relief only after it has filed in the appropriate circuit court of appeals its order and the record on which it is based. Since the Board's orders are not self-enforcing, it has sometimes been possible for persons violating the act to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible to restore or *preserve the status quo* pending litigation. 1 Legislative History of the Labor Management Relations Act, 433 (1947) (emphasis supplied).

Moreover, this court has placed strong emphasis on maintaining the status quo, thereby preserving the legal and factual issues for NLRB disposition. Boire v. Teamsters, *supra* at 788, 789, 792, 804.

■ Our research has disclosed only three district court decisions that treat the question whether a court should order interim bargaining between an employer and an uncertified union pursuant to § 10(j). Two courts denied relief, Fuchs v. Steel-Fab, Inc., 356 F.Supp. 385 (D.Mass.1973); Kaynard v. Lawrence Rigging, Inc., 80 LRRM 2600 (E.D.N.Y. 1972), and one granted it, Smith v. Old Angus, Inc., 81 LRRM 2936 (D.Md.1972). While courts have not hesitated to issue interim bargaining orders where a pre-established bargaining relationship is being eroded by unfair labor practices, Brown v. Pacific-Telephone & Telegraph Co., *supra*; Davis v. Servis Equipment Co., 341 F.Supp. 1298 (N.D.Tex.1972); Lebus v. Manning, Maxwell and Moore, Inc., 218 F.Supp. 702 (W.D.La.1963), the considerations are very different when the union's representative status has not been certified. We agree with the Eighth Circuit that the status quo to be preserved "is the last uncontested status which preceded the pending controversy." Minnesota Mining & Manufacturing Co., *supra* at 273. Here the signing of union cards precipitated the entire controversy; hence the *status quo ante* was that period prior to any union activity when the drivers and dockworkers were unrepresented. An interim bargaining order would materially alter that status, creating by judicial fiat a relationship that has never existed. Fuchs v. Steel-Fab, *supra*.

■ Additional reasons underlie our decision to refrain from commanding temporary bargaining. The Board enjoys primary authority as fact-finder and enforcer of the statutory scheme. Schauffler v. Local 1291, *supra*. When it ultimately rules on the unfair labor practice charges, the NLRB may well decide that a *Gissel*-type bargaining order is appropriate. NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Yet, absent surrounding unfair labor practices, an employer has no absolute duty to accept a card majority, but may petition the Board for an election. Linden Lumber Division v. NLRB, 419 U.S. 301, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974). Were we to order bargaining on the record before this court, our decision would rest on the assumption that Pilot and BBR had actually committed unfair labor practices—an assumption we are unwilling to make, given that the union has not yet been forced to prove its case by a preponderance of the evidence. We only hold that the district court was amply supported in its conclusion that there was reasonable cause to believe that such practices had been committed. These are matters peculiarly within the investigatory-adjudicatory province of the Board. Moreover, since NLRB law concerning when the duty to bargain arises in certain *Gissel* situations has recently shifted, *see* Elm Hill Meats, 213 NLRB No. 100, 1974–75 CCH NLRB ¶ 15,062, *supra* note 3, a present command to bargain might seriously impede orderly Board procedures.

No matter how this court decides the interim bargaining issue, one of the parties stands to be "hurt." If Pilot and BBR are required to bargain with the Teamsters now, our order might prove highly prejudicial to the employers' interests if the Board later determines the union does not enjoy representative status. Similarly, if we fail to require bargaining *pendente lite,* the union will have lost several months of representational services it could have performed on behalf of the employees, assuming the Board decides Local 512 is the employees' chosen bargaining agent. Faced with Scylla and Charybdis, we choose to await the Board's pronouncement. We are not convinced that a continuation of the non-bargaining status will so deleteriously affect the union that it cannot recover. Finally, then, interim bargaining involves too large a step for this court to take by means of an injunctive vehicle designed to preserve issues for ultimate determination by the Board.

The judgment of the district court is affirmed in all respects.

Affirmed.