Rodney D. JOHNSON, Acting Regional Director of the Fifteenth Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

SUNSHINE PIPING, INC., Respondent.

No. 5:02–CV–276 RV/MD.

United States District Court,
N.D. Florida,
Panama City Division.

Dec. 26, 2002.

Charles R Rogers, Natl Labor Relations BD, New Orleans, LA, for Rodney Johnson, Acting Regional Director of the 15th Region of the National Labor Relations Board for and on behalf of the National Labor Relations Board, petitioner.

John–Edward Alley, Robert D Hall, Jr, Tony B Griffin, Ford & Harrison LLP, Tampa, FL, for Sunshine Piping Inc, respondent.

### ORDER AND MEMORANDUM OPINION

VINSON, Chief Judge.

Rodney D. Johnson, the Acting Regional Director of Region 15 of the National Labor Relations Board ("the Board"), has filed a petition seeking a temporary injunction pursuant to Section 10(j) of the National Labor Relations Act [29 U.S.C. § 160(j) ] (doc. 1).

The Board seeks to enjoin the respondent, Sunshine Piping, Inc. ("Sunshine"), from engaging in activities that allegedly repressed Sunshine's employees from organizing into a union. Petitioner also seeks to require Sunshine to reinstate two former employees who were allegedly terminated for their union activities. This Court held a hearing on the petition for temporary injunction on October 24, 2002, and orally denied the petition. This order confirms that ruling.

## I. BACKGROUND

Sunshine is an incorporated business, located in Panama City, Florida, that manufactures lube pipe assemblies. The Board alleges that Sunshine engaged in a

campaign to prevent its employees from organizing into a union. Sunshine refutes these allegations.

According to the Board, in November of 2001, Sunshine allegedly threatened its employees with closing its facilities if the employees selected the United Association of Journeymen & Apprentices of the Plumbing & Pipefitting Industry of the United States and Canada ("Union") as the employees' exclusive representative. Other threats allegedly occurred in March 2002, including threats that an individual would not have been hired had management known of his prior union activity, that Sunshine's facilities would be closed if the employees selected the Union as their exclusive representative, and that other employees would be terminated because of their union activities. On March 5, 2002, Sunshine established the rule that certain forms of solicitation would not be permitted, including the promotion, endorsement, or advertisement of organizations, groups, or commercial entities by public display of logos, messages, or lapel pins on personal attire. This rule was allegedly established to impede the establishment of the Union at Sunshine. The campaign to select the Union as the employees' exclusive bargaining representative was started on March 20, 2002. On March 21, agents of Sunshine allegedly engaged in surveillance of the employees engaged in union activities. Later that day, Sunshine laid off 14 employees. On March 22, 2002, the Union filed a petition with the Board seeking to represent a unit of Sunshine's employees. On that day, Sunshine laid off five more employees. However, by June 10, 2002, Sunshine had recalled all but two of the employees who had been laid off, John Martin and Scott Pooser. The Board contends that Martin and Pooser were not recalled because they were two of the three main union activists (the third alleged union organizer, Joey Lee Kadel, was recalled).

According to Sunshine, after the terrorist attacks of September 11, 2001, and the Enron collapse, the energy business went into recession and Sunshine suffered a significant reduction in work orders from its primary customer, Siemens–Westinghouse.[1] In an effort to adjust to the reduced demand, and avoid a layoff, on February 25, 2002, Sunshine reduced its workers' standard work week from 50 hours to 40 hours. Sunshine also began filling orders ahead of time in order to provide enough work to maintain the number of workers employed by Sunshine. On March 7, 2002, there was a meeting where some employees complained that they were unhappy about the 40 hour work-week. Jim Scott, the CEO of Sunshine, told his employees that he hoped that the amount of available work would increase, but warned that layoffs were possible if it did not.

According to Sunshine, on March 15, 2002, the decision was made to have a layoff after the next pay period, which ended on March 21, 2002. Sunshine insists that the layoffs were for economic reasons and were not in response to any union activities. On March 21, 2002, 14 individuals were terminated. On March 22, another five were terminated. All of the layoffs were done on the basis of seniority, with consideration given to attendance and performance. Despite being laid off, due to turnover among the remaining employees and additional orders received, Sunshine offered recalls to seventeen of the terminated employees. Sunshine currently employs a workforce of 33 workers,

---

1.  Sunshine's business is confined to a small and limited market and involves the production of industrial-grade pipes for cooling systems for turbines in electrical generating plants.

down from 68 workers on March 21, 2002. Sunshine alleges it did not recall Martin and Pooser because of their poor attendance and performance records.[2] While Sunshine acknowledges that Martin was one of the union organizers with Kadel, Sunshine disputes the assertion that Pooser was a union organizer.

On March 29, 2002, the Union filed a charge with the Board alleging that Sunshine had engaged in, and was engaging in, unfair labor practices. It filed an amended charge on April 11, 2002, and a second amended charge on May 23, 2002. The Board issued a complaint and notice of hearing against Sunshine on May 31 2002. An amendment to the complaint and notice of hearing was issued on June 7, 2002, and a corrected amendment to the complaint and notice of hearing was issued on June 14, 2002. The hearing before the Administrative Law Judge on the Board's complaint was held in August of 2002. On August 21, 2002, the Board filed a petition for temporary injunction with this Court, seeking injunctive relief pending the final disposition of the matter.

Neither side wanted an immediate hearing on the petition for temporary injunction, but eventually a hearing was held before this Court on October 24, 2002. At the close of the hearing, this Court orally denied the Board's petition for temporary injunction. Soon thereafter, on November 1, 2002, Administrative Law Judge George Carson II of the National Labor Relations Board Division of Judges issued a decision against Sunshine, granting the relief petitioner seeks in its petition with this Court. That administrative matter is now before

the National Labor Relations Board. This order sets out the findings of fact and conclusions of law with respect to this Court's decision on October 24, 2002.

## II. DISCUSSION

### A. Temporary Injunction Standard

■ Ordinarily, there is a general prohibition in the Norris–LaGuardia Act [29 U.S.C. § 101, *et seq.*] against the issuance of injunctions in labor disputes. *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1188 (5th Cir.1975) (*"Pilot Freight"*).[3] Section 10(j), which specifically provides that "[t]he Board shall have power ... to petition ... for appropriate temporary relief or restraining order" [29 U.S.C. § 160(j)] acts as an exception to this prohibition, authorizing the Board to seek injunctive relief in limited circumstances. *Boire v. Int'l Brotherhood of Teamsters*, 479 F.2d 778, 787 (1973) (*"Teamsters"*). This was necessary because administrative resolution of labor disputes was "so time-consuming that guilty parties could violate the Act with impunity [sic] during the years of pending litigation, thereby often rendering a final order ineffectual or futile." *Arlook v. S. Lichtenberg & Co.*, 952 F.2d 367, 371 (11th Cir.1992). However, "[Section] 10(j) does not authorize the Regional Director to seek an injunction in *every* unfair labor practice case ...." *Teamsters, supra*, 479 F.2d at 787. The legislative history and the judicial decisions under both Sections 10(j) and 10(*l*) demonstrates that two prerequisites must be satisfied before an injunction is appropriate. *Id.* These two prerequisites are:

---

**2.** Kadel testified in an affidavit submitted by the Board that Jim Scott, the owner of Sunshine, told him that he would not rehire Martin or Pooser because they "were examples of employees who missed a lot of work." The employment records of Martin and Pooser reflect that both had poor attendance and performance records.

**3.** All decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding Eleventh Circuit precedent. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

(1) there must be reasonable cause to believe that the alleged unfair labor practices have occurred; and (2) the requested injunctive relief must be "just and proper." [4] *Arlook, supra,* 952 F.2d at 374 (*citing Pilot Freight, supra,* 515 F.2d at 1188–89).

■ If the two prerequisites are satisfied, the Board must then demonstrate: (1) a substantial likelihood that it will prevail on the merits of its claim; (2) irreparable injury will result without the injunctive relief; (3) the threatened injury outweighs the harm the injunction may cause the respondents; and (4) the injunction would not be adverse to the public interest. *Dahl–Eimers v. Mutual of Omaha Life Ins. Co.,* 986 F.2d 1379, 1381 (11th Cir. 1993). An injunction may not be granted "unless the movant clearly satisfies the burden of persuasion as to these four prerequisites." *A.L. Williams & Assoc. v. Stelk,* 960 F.2d 942, 947 (11th Cir.1992).

### B. Analysis

Section 10(j) does not authorize the Board to seek injunctive relief for any alleged violation——an injunction under Section 10(j) is only authorized where there is reasonable cause to believe that a labor violation occurred and where injunctive relief is just and proper. *Arlook, supra,* 952 F.2d at 371; *Pilot Freight, supra,* 515 F.2d at 1188–89; *Teamsters, supra,* 479 F.2d at 787.

■ **(1) Reasonable cause.** First, the Regional Director must demonstrate that a reasonable cause exists to believe that labor violations have occurred. "The district court's role in determining whether or not there is a reasonable cause to believe that labor violations have occurred is limited to evaluating whether the Board's theories of law and fact are not insubstantial and frivolous." *Arlook, supra,* 952 F.2d at 371 (*quoting Pilot Freight, supra,* 515 F.2d at 1189) (internal quotation marks omitted). The district court is not to evaluate the evidence and determine whether a labor violation has occurred *in fact,* but rather only whether the evidence, viewed in a light most favorable to the Board, could lead to the conclusion that "a rational factfinder *might eventually rule in favor of the Board.*" *Arlook, supra,* 952 F.2d at 372, 373 (emphasis in original)

To find reasonable cause, the Board must satisfy a legal question and a factual threshold. Satisfaction of the "legal question" component requires the Board to demonstrate a "substantial, nonfrivolous, coherent legal theory of the labor violation." *Arlook, supra,* 952 F.2d at 371 (*citing Teamsters, supra,* 479 F.2d at 792). The "factual threshold" component requires the Board to present enough evidence in support of its coherent legal theory to permit a rational factfinder, considering the evidence in the light most favorable to the Board, to rule in its favor. *Id.*

The Board proposes two alleged labor violations: that Sunshine engaged in activities to discourage the employee's union organizational activities, and that Sunshine laid of a number of employees on the basis of seniority so that it could terminate three

---

4. It must be emphasized that these two prerequisites do not alone determine whether a district court should grant injunctive relief. These two prerequisites determine only whether the Board has the power to *seek* an injunction. *Boire v. Int'l Bhd. of Teamsters, Etc.,* 479 F.2d 778, 787 (1973). Because the issuance of injunctions fall within the equitable powers of this Court, the well-established requirements for granting such equitable relief must also be fulfilled. *See Sharp v. Parents in Community Action, Inc.,* 172 F.3d 1034, 1038 (8th Cir.1999) ("When a federal statute authorizes injunctive relief, the presumption is that Congress intends the courts to exercise their traditional equitable discretion.")

employees who were alleged union activists. These theories are substantial, non-frivolous, and coherent. The evidence, viewed in a light most favorable to the Board, indicates that Sunshine had engaged in a number of anti-union activities, such as threatening employees with shutting down the plant if a union was established, telling an employee that Sunshine could promote a union activist so that he cold then be fired for union activity, reprimanding an employee for wearing a proun-ion tee-shirt, and other activities. Also, Sunshine did indeed terminate a number of employees, including three individuals that the Board contends were union activists. A rational factfinder, considering the evidence in the light most favorable to the Board, could rule in its favor. Thus, the Board had reasonable cause to believe that a labor violation had occurred.

■ **(2) Just and proper.** Section 10(j) is an extraordinary remedy to be used only in cases of egregious unfair labor practices, and equitable relief should be granted only under very limited circumstances. *Arlook, supra,* 952 F.2d at 374 (*citing Pilot Freight, supra,* 515 F.2d at 1192).) Therefore, even if reasonable cause is shown, injunctive relief is not appropriate unless it can also be demonstrated that such relief would be just and proper given the circumstances of the case. *Arlook, supra,* 952 F.2d at 372; *Pilot Freight, supra,* 515 F.2d at 1192; *Teamsters, supra,* 479 F.2d at 787. Injunctive relief is "just and proper" where the facts demonstrate that "without such relief, any final order of the Board will be meaningless or so devoid of force that the remedial purposes of the [National Labor Relations Act] will be frustrated." *Arlook* at 372. Examples of this include circumstances where organizational efforts are highly susceptible to being extinguished by unfair labor practices, where unions and employees have already suffered substantial damage from probable labor violations, and

where the violations reasonably found to have been committed will be repeated absent an injunction. *Id.* (*citing, e.g., Pascarell v. Vibra Screw, Inc.,* 904 F.2d 874 at 880, 881 (3d Cir.1990)); *Pilot Freight, supra,* 515 F.2d at 1194; *Szabo v. P\*I\*E Nationwide, Inc.,* 878 F.2d 207, 210 (7th Cir.1989). The Eleventh Circuit generally places strong emphasis on injunctions maintaining the status quo. *Pilot Freight* at 1192 (*citing Minnesota Mining and Manufacturing Co. v. Meter,* 385 F.2d 265 (8th Cir.1967); *Schauffler v. Local 1291,* 292 F.2d 182 (3d Cir.1961); *Brown v. Pacific Telephone and Telegraph Co.,* 218 F.2d 542 (9th Cir.1954); *accord Teamsters, supra,* 479 F.2d at 788–89. Nevertheless, an injunction that would "short-circuit the Board's processes should be sparingly employed." *Pilot Freight* at 1192. "If the trial court, in its discretion, does not believe that far-reaching mandatory relief would serve the purpose of the Act, it need not grant the full remedy requested by the Board." *Id.* at 1193.

■ The Board has not satisfactorily demonstrated that injunctive relief would be just and proper at this time. Although there is reasonable cause to believe that Sunshine may have engaged in unlawful activity, the evidence does not satisfactorily demonstrate that union organizational efforts are highly susceptible to attack, that the Union or employees have already suffered substantial damage from past labor violations, that the past violations are ongoing, or anything else showing that the extraordinary remedy of injunctive relief is warranted. *Cf. Arlook, supra,* 952 F.2d at 373 (employees testifying before district court that they were afraid to wear union clothing and stickers, participate in union activities, actively recruit new union members, and become stewards of the union, as well as fear of termination, indicated that injunction was just and proper). The

Board suggests that the injury is ongoing because Sunshine's activities created a "chilling effect on employee willingness to openly engage in protected union activity." However, the evidence in the record indicates that the Union itself was responsible for much of the "chilling" of interest in joining the Union. The record indicates that Sunshine's employees felt tricked into signing union cards based on warnings that failure to join the union would result in them "join[ing] the unemployment line." *See* Elmore aff. at 2. The employees were upset that the Union had made false representations about membership in the Union to such a degree that a number of them withdrew their support for the Union.[5]

The Board also suggests that the March layoffs and the failure to reinstate Martin and Pooser demonstrates a chilling effect on the part of Sunshine. Mass layoffs could indicate a chilling effect on the part of management. *See, e.g., Arlook, supra,* 952 F.2d at 374. However, the evidence demonstrates that due to the current economic downturn, Sunshine had to cut hours, fill orders in advance, and eventually lay off nearly half its workforce.[6] While the Board contends that Sunshine laid off its employees to punish them for their union activities, all but two of the former employees have since been reinstated. The evidence does not demonstrate a chilling effect sufficient to warrant the extraordinary remedy of injunctive relief.

The Board contends that Martin and Pooser were union activists and it asserts that Sunshine's failure to reinstate Martin and Pooser "will stand as a clear and forceful message to the remaining employees that union support or other protected activity will likely result in their discharge or otherwise adverse employment actions and that neither the Board nor the union can effectively protect them from such arbitrary employer retaliation." First, while it is undisputed that Martin was a union activist, the evidence does not establish Pooser as a union activist. The evidence reflects only that Pooser openly wore a union pin. Second, Sunshine reinstated Kadel who was also an acknowledged union activist. This undercuts the Board's theory that Sunshine's failure to rehire two of the three alleged union activists has a chilling effect on the other employees. Third, the evidence demonstrates that Sunshine failed to rehire Martin and Pooser, not because of their alleged union activities, but because of their poor performance and attendance records. Finally, the Board delayed filing the petition in this case for injunctive relief until August 21, 2001, five months after Martin and Pooser had been laid off. It would seem that any detrimental effect of the discharges have already taken its toll on the drive to unionize. Thus, "[i]t is questionable whether an order of reinstatement would be any more effective than a final Board order at this point." *Compare Pilot Freight, supra,* 515 F.2d at 1192, *with Arlook, supra,* 952 F.2d at 374. Further, this federal court proceeding was initiated at almost the same time as the administrative hearing was being held.

**5.** The Board suggests that the employees withdrawing their support for the Union evidences the "chilling effect" of Sunshine's actions. However, the evidence does not support the argument that the reason the employees withdrew their support for the Union was due to Sunshine's actions. Instead, the employees withdrew their support for the Union due to misrepresentations on the part of the Union.

**6.** Despite the Boards assertion that the March layoffs were designed to curb union activities, rather than due to economic pressures, the evidence reflects otherwise. Sunshine continues to maintained only 35 employees, as opposed to 68 employees on March 21, 2002.

In addition to seeking to enjoin Sunshine from engaging in alleged anti-union activities, the Board also seeks the reinstatement of Martin and Pooser. However, reinstatement of unlawfully discharged employees is a matter generally left to the administrative expertise of the Board. *Pilot Freight, supra,* 515 F.2d at 1192. Such a measure by this Court would short-circuit the Board's processes and should be sparingly employed. *Id.* The evidence reflects that both Martin and Pooser are now working at another company, earning a higher wage than they would at Sunshine. Additionally, Sunshine could not reinstate Martin and Pooser without terminating two other current employees. Under the facts and circumstances, it would not be just and proper to order their reinstatement.

Due to the extraordinary nature of injunctive relief, it should be employed "only under very limited circumstances." *Arlook, supra,* 952 F.2d at 374. In deciding whether injunctive relief is appropriate, maintenance of the status quo for final disposition by the Board is emphasized. *Pilot Freight, supra,* 515 F.2d at 1193; *accord Teamsters, supra,* 479 F.2d at 788–89. In this case, it appears that the status quo is being maintained without the intervention of this Court. The Administrative Law Judge has already ruled on the Board's complaint. The alleged unlawful actions of Sunshine do not appear to be so egregious that "any final order of the Board will be meaningless or so devoid of force that the remedial purposes of the Act will be frustrated." *Pilot Freight, supra,* 515 F.2d at 1192. Use of the extraordinary remedy of injunctive relief does not appear just or proper at this time.

I conclude that the Board has not satisfied the prerequisites for injunctive relief pursuant to Section 10(j) of the National Labor Relations Act

### III. *CONCLUSION*

For the forgoing reasons, the petition for temporary injunction (doc 1) is DENIED.