[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14508
_____

D.C. Docket No. 0:12-mc-60978-WJZ

NATIONAL LABOR RELATIONS BOARD,

Plaintiff - Appellant,

versus

HARTMAN AND TYNER, INC.,
d.b.a. Mardi Gras Casino,
HOLLYWOOD CONCESSIONS, INC.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 16, 2013)

Before MARCUS, BLACK and SILER,[*] Circuit Judges.

MARCUS, Circuit Judge:

_____

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

The National Labor Relations Board ("NLRB" or the "Board") appeals from the district court's decision to deny the NLRB temporary injunctive relief pending a final order from the NLRB in administrative proceedings.  The underlying labor dispute involves an administrative complaint filed by the NLRB against Hartman and Tyner, Inc. d/b/a Mardi Gras Casino, and Hollywood Concessions, Inc. ("Mardi Gras").  The NLRB claims that Mardi Gras unlawfully discharged employees who were involved in a union organizing campaign on behalf of UNITE HERE Local 355 ("the Union").  Under section 10(j) of the National Labor Relations Act, the NLRB has the power to petition a federal district court "for appropriate temporary relief or restraining order" pending the resolution of the administrative proceedings.  29 U.S.C. § 160(j).  It did so in this case, and the primary relief it sought was temporary reinstatement of six of the discharged employees.

After extensive briefing and an evidentiary hearing, the district court denied the petition in material part.  The district court applied the correct legal standard, recognizing that interim injunctive relief of this kind should be granted only when two conditions are satisfied: (1) there is reasonable cause to believe that the alleged unfair labor practices have occurred, and (2) the requested injunctive relief is just and proper.  See Arlook v. S. Lichtenberg & Co., Inc., 952 F.2d 367, 371 (11th Cir. 1992).  At issue on appeal is only the second of these requirements, and we

2

conclude, after thorough review, that the district court did not abuse its considerable discretion in concluding that interim reinstatement of the discharged employees was not "just and proper."

## I.

Mardi Gras operates a casino and greyhound racetrack in Hallandale Beach, Florida. The casino employs around 220 employees.[1] In August 2004, Mardi Gras and the Local 355 entered into a Memorandum of Agreement in which Mardi Gras committed to take a "neutral approach to unionization." The specifics of the agreement are not pertinent to this case, but the gist of the relevant provisions for present purposes was that Mardi Gras agreed to recognize the Union as a collective-bargaining representative if a majority of employees signed Union authorization cards, and the Union in turn agreed not to engage in organizing efforts in the casino's public areas or during the employees' working times. See generally Mulhall v. UNITE HERE Local 355, 618 F.3d 1279, 1284-85 (11th Cir. 2010) (describing the Memorandum of Agreement).

The Memorandum of Agreement was set to expire on December 31, 2011,[2] and the workforce at Mardi Gras remained non-unionized. Although there had been intermittent organizing efforts in the past, the Union, faced with this deadline,

---

[1] Mardi Gras claims there are actually 339 employees, but accepts the 220 number for purposes of this case.

[2] Mardi Gras claims the Memorandum of Agreement actually expired October 24, 2011, but, again, accepts the December 31 expiration date for purposes of this case.

mounted a full campaign in the Fall of 2011 to organize the Mardi Gras workforce. Pursuant to the Memorandum of Agreement, the Union obtained a list of employees from Mardi Gras and began visiting them at home. By October 2011, the Union had assembled an employee organizing committee that consisted of around 20 Mardi Gras employees, who then visited the coworkers in their respective departments to try and get them to sign the Union authorization cards. Many of the employees were visited multiple times.

The organizing campaign had some initial success, but, as of the date of the district court's ruling, the Union had only obtained 92 authorization cards, a fair bit short of forming a majority of the 220 employees in the bargaining unit. The dates the cards were returned matter in relation to the employee discharges at issue. The undisputed evidence shows that almost all of the authorization cards -- 80 of the 92 -- were returned by November 10, 2011, over a week prior to the first of the discharges on November 18. An additional four cards were returned between November 13 and November 15.

Of the six discharges, the first two occurred on November 18, the next three occurred on November 21, and the final one occurred on November 23. Five of the six discharges occurred in connection with unannounced Union visits to the casino. The two sides put very different spins on the events, but the basic facts are not in dispute. On November 17, 2011, a group of Union representatives showed

4

up at the main entrance of the casino with the ostensible purpose of introducing themselves to the casino's Vice President and CEO, Daniel Adkins. The Union delegation included eight off-duty members of the Mardi Gras employee organization committee, and four of the six discharges at issue were among those employees: Tashana McKenzie, Dianese Jean, Alicia Bradley, and Amanda Hill. The NLRB also claims, based on the testimony of lead Union organizer Michael Hill, that the Union delegation intended to exercise the Union's right under the Memorandum of Agreement to access the non-public areas of the casino (i.e., the break room) to speak with employees. Mardi Gras claims, in contrast, that this visit was a highly public stunt in order to spur a flagging unionization campaign, that the Union knew full well that Adkins was not interested in meeting, because he had so advised them in writing on October 31, and that the Union delegation stormed the casino and caused a disruption.

In any event, the delegation was asked to leave by security, and they did. The following day, November 18, a Union delegation returned to the casino. This time, the group included another of the six discharged employees, Theresa Daniels-Muse. The Union delegation was again asked by security to leave. The delegation requested that the casino call the police to document what, in the Union's view, was a violation of the neutrality agreement. Once the police arrived and after some discussion, the Union delegation left.

5

Later that day, the casino terminated Bradley and Jean, and suspended Daniels-Muse, McKenzie, and Amanda Hill for alleged misconduct in participating in the Union visit to the facility.  The three suspended employees were terminated on November 21.

The last of the six discharges at issue occurred a couple days later, on November 23.  According to Mardi Gras, employee Steve Wetstein, also a member of the organizing committee, "was dismissed for interfering with a co-worker's work by discussing union business while the two were on duty."  The NLRB puts a more benign face on it, noting that Wetstein asked a fellow employee to meet outside of work to discuss the Union, that the exchange took less than a minute and that employees often briefly discuss non-work matters while on duty, but that the casino nonetheless fired Wetstein for talking to the other employee.

## II.

On January 11, 2012, the Union filed charges with the NLRB alleging that Mardi Gras had engaged in and was continuing to engage in unfair labor practices in violation of the National Labor Relations Act, 29 U.S.C. §§ 151-169.  On April 30, 2012, the NLRB issued an administrative complaint.

Over four months after the Union filed charges, on May 22, 2012, the NLRB filed in the United States District Court for the Southern District of Florida a petition for temporary injunctive relief pursuant to section 10(j) of the National

Labor Relations Act, which it later amended with leave from the district court.[3] The operative petition alleges that Mardi Gras has violated and continues to violate in many ways sections 8(a)(1) and (3) of the National Labor Relations Act, which make it unlawful for employers "to interfere with, restrain, or coerce employees in the exercise of the[ir] [collective bargaining] rights" or to discriminate "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. §§ 158(a)(1), (3). In particular, the petition claims that Mardi Gras unlawfully discharged six of its employees because they joined the Union and to discourage other employees from engaging in unionization. The petition sought a variety of injunctive relief,[4] but the only relief at issue here is the request for temporary

---

[3] Section 10(j) provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).

[4] The NLRB requested an order enjoining Mardi Gras from engaging in unfair labor practices, including, inter alia, creating an impression that union activities are under surveillance, asking employees to report on the union activities of other employees, interrogating employees about union membership and activities, threatening employees with discharge or other reprisals for engaging in union activities, or actually discharging employees for engaging in union activities. The district court granted this request. The petition also requested several other orders requiring Mardi Gras to provide the Union with a list of all its current food and beverage, gaming, and

7

reinstatement of the six discharged employees. The district court conducted an evidentiary hearing on the amended petition on June 18 and 19, 2012. The witnesses at the hearing were Union organizer Michael Hill, the six discharged employees, a priest who had accompanied the Union delegation that went to the Mardi Gras casino on November 17, and the casino Vice President and CEO Adkins.

After the hearing, the district court entered an order granting the petition in part, but denying the petition's request for temporary reinstatement of the discharged employees. The district court began by recognizing our two part standard for section 10(j) injunctive relief: there must be reasonable cause to believe that the alleged unfair labor practices have occurred, and the injunctive relief must be just and proper. See Arlook, 952 F.2d at 371. The district court found that the NLRB had met both the legal and factual components of the first prong: it presented a substantial, nonfrivolous and coherent theory, and also presented enough factual evidence to support its legal theory and permit a rational factfinder to find in its favor. See id. at 371-72. That determination is not before us on appeal.

---

housekeeping employees, to grant the Union access to the casino's bulletin boards, to post copies of the district court's order at the casino, and to have a management official or an agent of the NLRB read the district court's order to employees during a meeting scheduled to ensure maximum attendance. The district court required Mardi Gras to provide the Union with a current list of employees, but denied the other requested relief.

The district court turned next to the issue before us: the equitable determination whether the injunctive relief of reinstatement was "just and proper." It began with the observation that measures of this kind are to be sparingly employed, because they act to short-circuit the Board's administrative processes, and because reinstatement of unlawfully discharged employees is an extraordinary remedy "generally left to the administrative expertise of the Board." Boire v. Pilot Freight Carriers, Inc., 515 F.2d 1185, 1192 (5th Cir. 1975).[5]  After considering the testimony and evidence presented at the evidentiary hearing, the district court remained unconvinced that there was a lingering threat of additional, unrealized harm flowing from the discharges that would warrant the extraordinary injunctive relief of temporary reinstatement.  The court concluded that the Union's organization drive had "grown cold" more than a week prior to any of the discharges at issue.  The court cited the number of cards returned each week: 80 in the period from November 1 to November 10, just 4 in the week prior to November 18 (the date of the first discharge), and 3 in the week following November 18.  Notably, the court found that "[e]ach of the six employees at issue was discharged after the Union had been otherwise unable to successfully organize, apparently due to a pre-existing reluctance on the part of the employees to participate."  The court also observed that it took the NLRB more than six

---

[5] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit issued before October 1, 1981.

9

months after the terminations and more than four months after the Union brought the terminations to the attention of the NLRB to file its section 10(j) petition.  It viewed the delay as further evidence that an order of temporary reinstatement would not likely be any more effective than a final Board order.  Thus, the court concluded that the remedy of temporary reinstatement was neither "just" nor "proper."

## III.

"[T]he district court's final conclusion regarding whether or not injunctive relief is 'just and proper' -- an exercise of the district court's equitable discretion -- can only be reversed by this court if it constitutes an abuse of discretion."  Arlook, 952 F.2d at 372.  Moreover, the trial court's factual findings are reviewed for clear error and thus "will not be disturbed unless clearly erroneous," while its legal conclusions "are subject to our plenary review."  Id.

Under section 10(j) of the National Labor Relations Act, the NLRB may petition the district court "for appropriate temporary relief or restraining order" and the district court "shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper."  29 U.S.C. § 160(j).  "Congress enacted § 10(j) because administrative resolution 'was so time-consuming that guilty parties could violate the Act with impugnity [sic] during the years of pending litigation, thereby often rendering a final order ineffectual or futile.'"

Arlook, 952 F.2d at 371 (quoting Pilot Freight, 515 F.2d at 1188) (alteration in original).  Thus, section 10(j) plays an important role in preserving meaningful administrative resolution of unfair labor practices claims.  See Pilot Freight, 515 F.2d at 1188 ("Congress . . . gave the labor board a discretionary tool to prevent erosion of the status of the parties pending its final decision.").  But care must be taken so that it remains "an extraordinary remedy, to be requested by the Board and granted by a district court only under very limited circumstances."  Arlook, 952 F.2d at 374.  Indeed, binding Fifth Circuit precedent singles out employee reinstatement as a particularly drastic remedy.  Pilot Freight, 515 F.2d at 1192 ("Proper composition of the bargaining unit, reinstatement of unlawfully discharged employees, and certification of the union as bargaining representative are matters generally left to the administrative expertise of the Board.  We believe that measures to short-circuit the NLRB's processes should be sparingly employed.  While it is true Congress implemented § 10(j) to aid the Board in administration of national labor policy, its scope should not overpower the Board's orderly procedures." (emphasis added)).

While the statute speaks only in broad terms, "[i]n an effort to further the principles underlying § 10(j), courts have fashioned a bipartite test for determining the propriety of temporary relief: (1) whether the Board, through its Regional Director, has reasonable cause to believe that unfair practices have occurred, and

(2) whether injunctive relief is equitably necessary, or, in the words of the statute, 'just and proper.'" Id. at 1188-89; accord Arlook, 952 F.2d at 371. Again, the "reasonable cause" standard is not at issue in this appeal.

Injunctive relief satisfies the "just and proper" standard "whenever the facts demonstrate that, without such relief, any final order of the Board will be meaningless or so devoid of force that the remedial purposes of the NLRA will be frustrated." Arlook, 952 F.2d at 372 (internal quotation marks and alteration omitted). We have expressly "decline[d] to delineate an entire list of factors" but have observed that prior case law "indicates that § 10(j) relief becomes 'just and proper' when organizational efforts are highly susceptible to being extinguished by unfair labor practices, when unions and employees have already suffered substantial damage from probable labor violations, and when the violations reasonably found to have been committed will be repeated absent an injunction." Id. (citing Pascarell v. Vibra Screw, Inc., 904 F.2d 874, 880-81 (3d Cir. 1990); Pilot Freight, 515 F.2d at 1194; Szabo v. P*I*E* Nationwide, Inc., 878 F.2d 207, 210 (7th Cir. 1989)). A district court abuses its discretion "when it misconstrues its proper role, ignores or misunderstands the relevant evidence, and bases its decision upon considerations having little factual support." Id. at 374.

None of those things occurred in this case. To begin with, the district court did not misconstrue its role; it articulated and applied the relevant legal standards

12

from our binding precedents, and the NLRB does not claim that the district court erred in this respect.  The question, then, is whether the district court made unsupported findings or ignored key evidence.  The district court's conclusion was largely based on two related considerations: (1) a factual finding that the testimony and evidence presented at the evidentiary hearing indicated that the Union's campaign to organize the Mardi Gras workforce had already grown cold more than a week prior to any of the discharges; and (2) the NLRB's more than four-month delay in bringing the petition was further evidence that no lingering harm caused by the discharges remained that would be better alleviated by temporary injunctive relief as compared to a final Board order.

Both of these conclusions were amply supported by the record, and, therefore, the district court did not clearly err in its factual findings or abuse its discretion in reaching its ultimate conclusion.  As for the first point, the numbers don't lie.  80 of the 92 total cards signed were signed by November 10, 2011, over a week before the first of the discharges at issue.  The following week, only 4 cards were signed, and the week after that -- i.e., the week following the discharges -- another 3 were signed.  Thus, the district court's factual finding that the organization campaign had dramatically slowed before the discharges took place was hardly clearly erroneous, and it is not apparent from the record that the discharges themselves had a clear chilling effect on the volume of cards coming in.

13

Or, to put it another way, under the circumstances the Union's organization efforts were not "highly susceptible to being extinguished by unfair labor practices," Arlook, 952 F.2d at 372, because the organization campaign was already faltering before the allegedly unfair labor practices had occurred. Thus, for example, the district court noted -- and the NLRB acknowledges -- that employee Wetstein testified that he conducted 40 to 60 home visits before his discharge and obtained only 5 cards, and that employee McKenzie contacted 20 to 30 employees and obtained no cards before her discharge, and only one card after. This is not a case -- or not clearly a case, in any event -- in which the Union campaign was humming along and then the discharges put it on ice.

The NLRB nonetheless responds that the district court failed to appreciate the chilling effect that the discharges had on the Union's campaign to organize. The NLRB cites testimony at the evidentiary hearing from the discharged employees who claimed that after their discharges, employees they visited were more fearful and were nervous about speaking to members of the Union. But each piece of testimony was undermined at least in part on cross-examination or in other parts of the employees' testimony. For instance, the NLRB cites the testimony of employee McKenzie that, after her discharge, employees generally did not answer the door when she attempted to visit them at home. But Mardi Gras points out that McKenzie visited twenty to thirty employees prior to her discharge and did not

14

obtain a single authorization card; her only success in obtaining one authorization card occurred <u>after</u> her discharge.    Employee Daniels-Muse spoke to two employees after her discharge; she testified that both told her they were afraid of losing their jobs if they participated in any Union activity.  But Daniels-Muse also testified on cross-examination that in fact both of those employees had elected to sign authorization cards, and neither asked her to revoke the cards or get them back in any way or otherwise withdrew their support for unionization.    Employee Bradley testified that employees ran and hid or told her they didn't want to talk to her when she visited them after her discharge.  Bradley testified as to conversations she had with three employees after her discharge, all of whom told her that they were scared and didn't want to be a part of the Union for fear of losing their jobs. But Bradley also testified on both direct and cross examination that one of the three employees actually signed an authorization card.  In addition, she said that even prior to her discharge she only was able to get one employee out of ten to sign an authorization card; the other nine told her no.

Additional record evidence arguably undermines the Board's view.  The evidence at the evidentiary hearing demonstrated that after the discharges, attendance at Union meetings stayed the same or even slightly increased.  Indeed, the record also demonstrated that no one sought in any way to rescind or revoke their authorization cards following the discharges.  Employee Hill testified that all

15

of the co-workers in her department signed authorization cards prior to her discharge, and that none of these employees sought to rescind their authorization card after her discharge.  The NLRB does not dispute this testimony; rather, it acknowledges that "[i]t appears that few, if any, employees asked the Union to return their signed cards" and that "attendance at Union meetings endured after the discharges."  The NLRB views the evidence in a different light than did the district court, urging that it demonstrates that "there is still a 'spark to unionize' at the Casino," and that reinstatement will rekindle the organization effort or provide the "jump start" the effort needs.

The NLRB's problem here is that the weight to be accorded competing pieces of evidence or the act of choosing between plausible but competing views of the record is a classic exercise of a district court's factfinding function that we are not permitted to redo on appellate review.  See, e.g., Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."); Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 857 (1982) ("An appellate court cannot substitute its interpretation of the evidence for that of the

16

trial court simply because the reviewing court might give the facts another construction [or] resolve the ambiguities differently . . . ." (internal quotation marks omitted)). None of the NLRB's arguments provide a basis to overturn the district court's exercise of its considerable equitable discretion, or demonstrate that the district court's factual findings about the state of the Union organization campaign at the time of the discharges were clearly erroneous. Our appellate review is limited, and the district court's reasonable reading of the entire record cannot be overturned.

The NLRB also faults the district court for relying on the NLRB's delay in filing a section 10(j) petition. But the delay between the time of the discharges or the Union complaints and the time the NLRB filed its section 10(j) petition is relevant, and the district court did not abuse its discretion by relying on it. See Pilot Freight, 515 F.2d at 1193 ("The Board waited three months before petitioning the district court for temporary relief. Although the time span between commission of the alleged unfair labor practices and filing for § 10(j) sanctions is not determinative of whether relief should be granted, it is some evidence that the detrimental effects of the discharges have already taken their toll on the organizational drive."). It is relevant because delay makes it difficult to justify granting temporary injunctive relief when that relief may not be "any more effective than a final Board order" several months after the alleged unfair labor

practices have occurred. Id. The district court did not examine the delay for delay's own sake or craft any kind of bright line rule, but rather viewed the delay as further evidence that the Union's organizational drive was not likely to gain any additional marginal benefit from temporary injunctive relief as opposed to a final Board order. It was entitled to do so, and, again, did not abuse its discretion. See id.

Moreover, this is not a case where the delay is of little moment because of the "on-going, cumulative nature of the allegedly unfair labor practices." Vibra Screw, 904 F.2d at 881 (six month delay was not too long in light of ongoing harms and other circumstances of the case). In such cases, temporary injunctive relief may still be of great value to protect against ongoing harms, even if the initial harm is in the distant past. But here, there has been no allegation of any ongoing unfair labor practices after the six discharges at issue, or any indication that "the violations reasonably found to have been committed will be repeated absent an injunction." Arlook, 952 F.2d at 372.

Quite simply, the district court did not abuse its discretion in concluding that the temporary reinstatement of six discharged employees was not a "just and proper" form of relief requested by the Board in this section 10(j) proceeding. We affirm.

**AFFIRMED.**

18